FANNIE WETZEL, ADMINISTRATRIX, APPELLEE, v. OMAHA MATERNITY & GENERAL HOSPITAL ASSOCIATION, APPELLANT.

FILED JULY 14, 1914. No. 17,580.

1. **Hospitals:** NEGLIGENCE OF EMPLOYEES: LIABILITY. A hospital, incorporated and conducted for private gain, is liable in damages to patients for the negligence of nurses and other employees.

2. ———: TORTS: LIABILITY. The general principle that a master is responsible for the torts of a servant in the scope of his employment applies to hospitals incorporated and conducted for private gain.

3. ———: IMPLIED OBLIGATIONS. A patient is generally admitted to a hospital, conducted for private gain, under an implied obligation that he shall receive such reasonable care and attention for his safety as his mental and physical condition, if known, may require.

4. ———: NEGLIGENCE: QUESTION FOR JURY. In an action against a hospital, conducted for private gain, to recover damages for negligence in caring for a delirious patient whose death resulted from his jumping from an unprotected, unfastened, and unguarded window in absence of an attendant, the issue of negligence *held* to be for the jury, where the evidence tended to show that he was knowingly admitted to the hospital under an implied obligation that he should receive such reasonable care and attention for his safety as his mental and physical condition required, and that the nurse in charge, at the time of the accident, had been absent for a period estimated by one witness to be less than five minutes and by another to be about an hour.

APPEAL from the district court for Douglas county: ABRAHAM L. SUTTON, JUDGE. *Affirmed.*

*William Baird & Sons* and *De Bord, Fradenburg & Van Orsdel,* for appellant.

*Sullivan & Rait* and *John O. Yeiser, contra.*

ROSE, J.

This is an action to recover $20,000 for alleged negligence resulting in the death of Alva J. Wetzel. Plaintiff is the administratrix of his estate. The Omaha Maternity & General Hospital Association, defendant, is a corporation conducting at Omaha a hospital for private gain. When Wetzel was ill with typhoid fever, he became a patient, occupying a room on the third floor of the hospital. In absence of a nurse or other attendant, he opened a window and jumped out, falling to the pavement. From resulting injuries death ensued. In the petition it is alleged that he was knowingly admitted as a patient when in a delirious condition, being constantly under some hallucination impelling him to leave his bed, to inflict self-injury, and to commit other irrational acts; that he was accepted as a hospital patient under an implied obligation on the part of defendant to furnish "all the care, nursing, attention, control, oversight and medical treatment necessary, suitable or appropriate to his condition;" that, while he was suffering from mental derangement as a result of typhoid fever, he was negligently permitted to remain for

a long time entirely free, unrestrained, unattended, unguarded and uncontrolled in his room on the third floor of the hospital, defendant well knowing that the window of his room was unbarred, unlocked and unfastened; that the facts pleaded constitute a negligent omission of duty and a breach of defendant's implied undertaking to furnish and supply him with all the care, nursing, medical treatment and oversight necessary, suitable and proper for him in view of his physical and mental condition. Defendant denied negligence, and pleaded that Wetzel became a patient under a contract to give him general care only, and that he received such care. The answer also contains a denial that defendant undertook or promised to furnish Wetzel with all the care, nursing, attention, control, oversight and medical treatment necessary, suitable or appropriate to his condition. The jury rendered a verdict in favor of plaintiff for $5,500. From a judgment for that sum, defendant appealed.

The principal assignment of error is directed to the overruling of a motion by defendant for a peremptory instruction in its favor; the ground of the motion being that there is no evidence of actionable negligence. In support of the position thus taken, defendant insists that hospital patients were received under two forms of agreement, one for "special care" at the rate of $25 a week, and the other for general care at the rate of $10 a week; that special care required constant attention of a nurse in a separate ward; that general care required defendant to provide the patient with a bed in a ward with other patients, all under the charge of a single nurse; that Wetzel was entitled to and received general care; that there is no evidence to support the allegation that he was negligently permitted by defendant to remain for a long time entirely free, unrestrained, unattended, unguarded and uncontrolled in his room; that the nurse in charge of decedent had also the care of another patient in the same room and a patient in another room; that she had not been absent to exceed five minutes when Wetzel escaped; that when

she left there was nothing to indicate a tendency on his part to inflict self-injury; that the attending physician was selected by Wetzel or his friends; and that the nurse obeyed all of the physician's instructions. It is argued that the facts narrated were established without contradiction, and that therefore a verdict for defendant should have been directed.

There is testimony tending to prove the following facts: Wetzel had typhoid fever in his own home, but was taken to the hospital for better care and attention. The attending physician was selected by him and treated him both before and after his removal to the hospital. He had been intermittently in a delirious condition from fever before he became defendant's patient, and remained so. A member of a fraternal lodge, under authority from Wetzel and his wife, called the hospital by telephone to make financial arrangements for decedent's care, and was told in answer to inquiries that arrangements had already been made for general care at $10 a week, which was sufficient for a patient in his condition. Somebody in the hospital office had authority to answer telephone calls and to make arrangements for receiving patients, though the general manager testified he had not been informed of any telephone call on Wetzel's behalf. On cross-examination he was asked: "In view of the known condition of the patient, you expect to give him the care that the condition requires?" He answered: "I will say yes, as far as that condition is known, for the time being." The hospital was advised in advance that he had been delirious. To protect him from harm the hospital nurse, on her own initiative, but with the subsequent approval of the physician, kept him for a time strapped to his bed. Though his fever remained high and his delirium continued, the straps were released by direction of the physician to permit frequent change of position, made necessary by premonitions of hypostatic pneumonia. The lower sash of the window was movable, unfastened and unprotected, when he jumped out. The nurse in charge at the time was an em-

ployee of defendant. Though she testified she had not been gone five minutes, the other patient in the same room said, in substance, that she had been gone nearly an hour. The nurse knew his condition. A day or two earlier he had been delirious the greater part of one night, and the clinical record of the hospital so recited. That record stated also that he seemed dazed on the morning of his injury, and that he afterward jumped out of the window.

Defendant was incorporated to conduct a hospital for private gain, and as such it is liable in damages to patients for the negligence of its nurses and other employees. *Hogan v. Hospital Co.,* 63 W. Va. 84, 59 S. E. 943; *Fawcett v. Ryder,* 23 N. Dak. 20; *Arkansas Midland R. Co. v. Pearson,* 98 Ark. 399, 135 S. W. 917; *University of Louisville v. Hammock,* 127 Ky. 564, 106 S. W. 219; *Brown v. La Société Francaise,* 138 Cal. 475; *Croupp v. Garfield Park Sanitarium,* 147 Ill. App. 7; *Stanley v. Schumpert,* 117 La. 255, 41 So. 565, 6 L. R. A. n. s. 306; *Galesburg Sanitarium v. Jacobson,* 103 Ill. App. 26; *Sawdey v. Spokane Falls & N. R. Co.,* 30 Wash. 349; *Gitzhoffen v. Sisters of Holy Cross Hospital Ass'n,* 32 Utah, 46, 8 L. R. A. n. s. 1161; *Phillips v. St. Louis & S. F. R. Co.,* 211 Mo. 419, 111 S. W. 109, 17 L. R. A. n. s. 1167.

The rule of law stated rests on the general principle that a master is responsible for the torts of a servant in the scope of his employment. This doctrine applies to a hospital receiving for special care delirious patients, who on account of temporary conditions produced by fever or other ailments are not accountable for their own acts or conduct.

A patient is generally admitted to a hospital, conducted for private gain, under an implied obligation that he shall receive such reasonable care and attention for his safety as his mental and physicial condition, if known, may require. *Hogan v. Hospital Co.,* 63 W. Va. 84, 59 S. W. 943; *Fawcett v. Ryder,* 23 N. Dak. 20; *University of Louisville v. Hammock,* 127 Ky. 564, 106 S. W. 219. Any other rule would be a reproach to the law and to hospital manage-

ment. In the present case the evidence is sufficient to justify a finding that decedent was received under circumstances entitling him to the benefit of the principle stated. Duties which a hospital as such owes to a patient cannot be evaded by proof that the hospital nurse obeyed the instructions of the physician employed by him. Nurses necessarily have charge of delirious patients during the absence of physicians, while the responsibility of the hospital continues. In the present case the nurse knew that the patient was in danger from delirium. For his protection she had strapped him to his bed and the patient's physician had approved her act. A clinical record made by her shows that the patient was in a dazed condition a few hours before he left his bed. Under the circumstances, self-injury may well have been foreseen. The patient was left near a movable, unfastened, unprotected window sash in a room three stories above the pavement. He, in fact, committed an irrational act resulting in his death. It cannot be said, as a matter of law, that there was no proof of negligence on her part or on the part of her employer. A nurse's absence of five minutes may amount to negligence. *Croupp v. Garfield Park Sanitarium*, 147 Ill. App. 7. Under the circumstances of this case, as already outlined, the question of negligence was an issue of fact for the jury. *Phillips v. St. Louis & S. F. R. Co.*, 211 Mo. 419.

Plaintiff made a case entitling her to damages in some amount, upon a finding by the jury in her favor, and the question of an excessive recovery is not properly raised.

Rulings in giving and in refusing instructions are challenged as erroneous; but, in view of the conclusion reached in regard to the evidence and the law applicable thereto, there is no error apparent in the charge to the jury or elsewhere in the record.

AFFIRMED.

SEDGWICK, J., dissenting.

It is said in the majority opinion: "A patient is generally admitted to a hospital, conducted for private gain, under an implied obligation that he shall receive such rea-

sonable care and attention for his safety as his mental
and physical condition, if known, may require.   *   *   *
Duties which a hospital as such owes to a patient cannot
be evaded by proof that the hospital nurse obeyed the in-
structions of the physician employed by him. ' Nurses nec-
essarily have charge of delirious patients during the ab-
sence of physicians, while the responsibility of the hospital
continues. In the present case the nurse knew that the
patient was in danger from delirium." The decision seems
to be based upon these propositions. The opinion assumes
without discussion that notice to the nurse was notice to
the hospital authorities, and that those authorities would
be guilty of negligence if they did not discover the errors
in the instructions of the physician and overrule those in-
structions.

There is no doubt that hospitals conducted for gain
ought to be held to a very high degree of diligence in
guarding the safety of helpless patients confided to their
care. They should be compelled to respond in damages
for any injury caused by the negligence of the employees
under their control. With the advance in medical science
and skill the necessity for special equipment and conven-
iences for caring for the sick becomes more apparent. It
has been stated in recent periodical publications that the
number of hospitals in the United States has doubled
within the last three years. It is therefore not only im-
portant that these institutions should be diligent in car-
ing for their patients, but it is also equally important that
they should not be held responsible either for accidents
beyond their control, or for the irresponsible acts of a pa-
tient that no human precautions could have anticipated,
or for the mistakes of others not under their control. For
the purpose of this discussion we may consider that there
are three general classes of hospitals: First, hospitals
established as a pure charity caring for the unfortunates
without charge; second, private hospitals for gain, which
furnish accommodations, appliances and medical treat-
ment; third, those that furnish rooms and appliances for

physicians who take their patients there, select the rooms appropriate to the conditions of their patients, employ nurses and instruct them as to the care needed, and treat their patients there professionally. The responsibility of a hospital of the second class, the patients' rooms, care and professional treatment all being furnished by the same authority, is well defined in the law. The three cases cited in the majority opinion, *Hogan v. Hospital Co.*, 63 W. Va. 84, 59 S. E. 943, *Fawcett v. Ryder*, 23 N. Dak. 20, and *University of Louisville v. Hammock*, 127 Ky. 564, 106 S. W. 219, are of that class. Such hospitals receive their patients "under an implied obligation that he shall receive such reasonable care and attention for his safety as his mental and physical condition, if known, may require." The mistake of the majority opinion, as it seems to me, is in treating the case at bar as one of that class. The responsibility of a hospital of the third class is more analogous to the liability of a hotel than to the liability incurred by a hospital which assumes the entire care and treatment of a patient. Such hospital is responsible for what it undertakes as is a hotel. Negligence of employees under its control in performing the duties of the hospital is negligence of the hospital. But the physician is independent of the hospital, and it is not responsible for his negligence, nor for the negligence of those who are under his control and act in accordance with his instructions. A patient should have a room and care suited to his condition. One violently insane may require a padded cell or manacles. One dangerously delirious, or inclined to self-destruction, might require that his door should be kept locked and his windows protected with iron bars to prevent his escape. To so treat a patient with fever might be so annoying as to endanger his life. Such matters are determined by the attending physician, who knows the patient's condition, and who may be mistaken, but is the only person at all qualified to judge what treatment and care of the patient will be most likely to succeed. The question then is whether the death of the deceased was caused by the negligence of the defendant.

It appears that the deceased, a young man between 20 and 30 years of age, became ill with typhoid fever at his rooms where he was residing with his wife, and was in the professional care of Dr. Pinto, a physician and surgeon. The physician advised that he be removed to the defendant hospital. The deceased and another patient in the same room and a third patient in another room were all under the care of the same nurse. The deceased, before his removal to the hospital, and while he was in the hospital, showed signs of delirium, which is a common accompaniment of the disease from which he suffered. Two or three days before the accident the nurse had discovered a tendency on the part of the patient to leave his bed, and had fastened his ankles with straps to the bed frame to prevent his doing so. The physician visited him each day, and when he ascertained that the nurse had used these straps he approved of her doing so, but on a following day he discovered that a complication, which the physicians describe as hypostatic pneumonia, had developed, and instructed the nurse to remove the straps in the daytime so that the patient could frequently be turned in the bed. This the nurse did, and on the morning of the accident, after the patient had been given his usual alcohol bath, she left the room for the purpose of making, as she said, the record of the patient's condition, and while she was gone, and before she had completed the record, the accident occurred.

It is urged that it was negligence on the part of the nurse to leave the room, under the circumstances, while the patient was not confined, and so permit the accident. In this connection it is insisted that there was a special contract on the part of the friends of the patient with the authorities of the hospital that the patient should have such care and attention as the circumstances and his condition should require; that he should have constant attention and should not be left alone; and that the act of the nurse in leaving him alone as she did was negligence. It appears that the deceased was a member of the "Yeomen

Lodge," presumably a fraternal organization, and that members of that lodge made the arrangements with the hospital authorities for his reception at the hospital. Mr. Wardlow testified that he "belonged to the Brotherhood of American Yeomen, and that Wetzel belonged to the same;" that he (the witness) called the hospital, and, "when they answered the 'phone, he told them he wanted to talk to somebody that he could make financial arrangements with about the care of the patient;" and that somebody then came to the 'phone, and the witness told him that he understood that a patient had been cared for there, and that "the lodge guaranteed the financial end of it;  *  *  *  and that he would like to make some such arrangement as that." They told him he could make such arrangement, and he testified that Gorton Roth made the arrangements. The witness also testified: "That he talked with a party over the 'phone in regard to care and attention, asked them what they would cost; and they said arrangements had been made for $10 a week general care; and he asked them if that was sufficient to care for a patient in his condition, and they said it was. He said to them, if it was not enough to care for a patient in his condition, that he would want to have better arrangements made; that he didn't want anything to go lacking on account of the care of the patient;  *  *  *  that he said he understood that Mr. Wetzel was in a delirious condition some of the time, and that the doctor said he must not get on his feet, and the man replied that about two-thirds of the patients under general care at that time were typhoid patients;  *  *  *  that they said in general care there were sometimes two or three, maybe four, patients in one room; and private care, patients had a room by themselves." The evidence is that the hospital authorities were never informed as to the condition of the patients in regard to the necessity for general or special care; that such matters were left entirely to the friends of the patients as advised by the physician, and that special care involved the use of a special room and the attention of

such special nurses as the physician advised, sometimes two or three, or even more, and that to have the continual, undivided attention of a nurse would require the employment ordinarily of three nurses, who would each serve for 8 hours out of the 24. These conditions and the authority of the physician in the matter appear to have been assumed by both Mr. Wardlow and the person at the hospital with whom he talked; Mr. Wardlow's object being, principally at least, to assure the hospital authorities that the bills would be paid. The evidence of the authorities at the hospital and of the physician, is conclusive that the responsibility to determine the condition of the patient and what service was necessary for his care and safety rested entirely with the physician, and was so understood by the nurses, who relied entirely upon the physician for instructions in that regard. Even if this were not so, it is difficult to understand how the physician and nurse could be charged with negligence in the care of this patient. The nurse testified directly and positively that she had not left this patient five minutes when the accident occurred. In the brief the plaintiff attempts to discredit this testimony by computation of time based upon the testimony of another patient who was in the room at the time, who testified that he was dozing, and that the first that he knew about any part of the transaction was that the patient arose from his bed and undertook to appropriate some of the witness' clothing; that the witness called for the nurse, and as the nurse, or one of the attendants, came into the room the patient escaped from the window. The testimony of this witness comes far short of discrediting the evidence of the nurse, who appears to be a creditable and reliable witness.

It was insisted that the defendant is responsible for the mistake of the nurse, if it was a mistake, in removing the straps, knowing as she did that the patient would at times be left without an attendant. It appears that the hospital furnished the room and its furniture and the necessary appliances, and also supplied nurses as desired.

The evidence is without contradiction that the nurses who waited upon the respective patients were always under the direction of the physician in charge, and in this case the nurse took her directions entirely from Dr. Pinto. The doctor testifies that she followed his directions explicitly, and that the patient had good care. Moreover, as I understand the evidence, it fails to show any negligence on the part of the physician or the nurse in removing the straps that confined the patient. The evidence is that the development of hypostatic pneumonia in a patient suffering from typhoid fever is a very dangerous complication; that because of accumulations in the lungs it is absolutely necessary that the position of the patient should be frequently changed, and that if he was allowed to remain continually in the same position the result would undoubtedly be fatal.

The court instructed the jury that the charge of negligence in the petition was: "That defendant was negligent in leaving the deceased at the time unrestrained, unattended, unguarded and uncontrolled, and that said negligence was the proximate cause of deceased's death." The court also instructed the jury: "You are instructed Dr. Pinto was the doctor and agent of the said deceased, and for that reason it was the duty of the defendant hospital and the said nurse to obey said doctor in carrying out his directions while attending said deceased, and you are not to consider the removal of the foot restraints by the said nurse as an act of negligence." The jury were also instructed: "If the defendant accepted Wetzel as a patient and undertook to give him such care, nursing and attention as was reasonably necessary in view of his known condition, and failed to keep and perform its undertaking, then and in that case the defendant is liable if the death of Wetzel resulted proximately from such failure, and your verdict should be in favor of the plaintiff, providing you find that said deceased would have recovered from said sickness had he not jumped from said window." This instruction was clearly erroneous. The evidence would not

justify submitting to the jury the question whether the defendant "undertook to give him such care, nursing and attention as was reasonably necessary in view of his known condition." As I have already shown, all these matters were entirely for the attending physician, and the defendant had no knowledge nor means of knowledge as to "his known condition" or what care, nursing and attention was reasonably necessary in view of such condition. When the physician ordered the confining straps removed, he best knew the patient's condition, and he judged that such removal was necessary in view of that condition. The evidence establishes that the probability that the patient in the condition he then was would do violence to himself was very remote. The nurse might confidently rely upon the judgment of the physician. The physician knew that the patient was receiving what was commonly known as general care, and that he was not being continuously attended by a special nurse. If such special attention was necessary, it was for the physician to ascertain that fact and to give directions accordingly. In the absence of such directions from the physician, the nurse was fully justified in continuing as she had been doing with the knowledge and approval of the physician.