# RURAL EDUCATION ASS'N, INC. v. ANDERSON.—
## 261 S. W. (2d) 151.

Middle Section.   June 26, 1953.

Petition for Certiorari denied by Supreme Court, October 9, 1953.

210

Dan E. McGugin and Cecil Sims, both of Nashville, for plaintiffs in error.

Norman & Keefe, of Nashville, for defendant in error.

FELTS, J. This is an action for negligently causing the death of plaintiff's husband, M. V. Anderson. He was seriously ill and suffering from mental derangement. He was brought to defendant's hospital, accepted as a patient for hire and put on a bed near a window on the second floor. A few hours later he fell or jumped out this window and received injuries from which he later died.

The negligence charged was that defendant knew he was deranged and, if not watched, might get out of bed and harm himself; that it undertook to furnish him the care and attention proper to his condition and required for his safety; that it neglected to give him such care and

attention, but put him on the second floor near a window not securely fastened, left him there unattended, let him in his delirium fall or jump out, and thereby negligently caused his death.

There was a general verdict and judgment for plaintiff for $7,000. Defendant appealed in error and has assigned numerous errors. Its first insistence is that a verdict should have been directed for it upon the ground that there was no evidence of any negligence on its part and upon the ground that plaintiff and her daughter, the sole beneficiaries of the recovery sought, were guilty, as a matter of law, of contributory negligence which barred this suit.

These issues involve a review of the evidence, not to weigh it or find the facts, but only to determine whether there was any substantial evidence to support the verdict; whether taking the evidence for plaintiff as true and discarding all countervailing evidence, it was sufficient, in reason and in law, to permit the jury to find a verdict for plaintiff. Smith v. Sloan, 189 Tenn. 368, 376-377, 225 S. W. (2d) 539, 542, 227 S. W. (2d) 2; Spivey v. St. Thomas Hospital, 31 Tenn. App. 12, 16, 211 S. W. (2d) 450.

Defendant is a corporation which carries on a number of activities. Among other things, it owns and operates Madison Sanitarium and Hospital, which receives and treats patients for hire. It employs a manager, attendants, nurses, interns, resident physicians, a medical director; and it has on its staff physicians and surgeons who stay at the hospital and treat its patients. It holds itself out as equipped to care for mental patients as well as medical and surgical patients.

Plaintiff's husband was 59 years of age and was suffering from emphysema, or shortness of breath, and a stomach ailment which often caused vomiting. He was in the

habit of taking demerol, a narcotic, to relieve his pain; and he was very restless and at times mentally deranged. His mind was often so disordered that he did not know what he was doing and he would have insane delusions.

In the latter part of July, 1949 his condition became so bad that plaintiff called Dr. Adams, her brother-in-law who lived in Texas, and he came here, examined her husband, and conferred with his physician, Dr. Sikes. It was first proposed to send him to the Central State Hospital for the insane. The family, however, did not want to do that but preferred to send him to a private institution for the care of mental patients.

Dr. Adams went to defendant's hospital and talked to its medical director, Dr. Gant, and another member of its staff, Dr. Schuler, and Mr. Aaby, its employee in charge of admissions. He told them the patient was deranged and there was danger that he might harm himself if not put on the ground floor and properly watched. They assured Dr. Adams that they would properly look after and care for the patient.

He was admitted to defendant's hospital on August 4, 1949 and was given a room on the ground floor. He remained there until August 18th, when his condition had improved and he was taken home. In a few days he grew worse and was taken to St. Thomas Hospital. After he had been there a few days the hospital authorities called plaintiff and told her his mental condition was such that they could keep him no longer.

She brought him home, called Dr. Schuler by telephone, explained her husband's mental condition, and the doctor told her to bring her husband to defendant's hospital and they would care for him. Dr. Schuler also told her that he was going away the next morning for a vacation but would leave instructions for the care of her husband at

the hospital. Among the instructions he left were these: "Low bed, sideboards and restrain if necessary. Soft diet."

On the next day, Sunday, September 4th, she had her husband taken in an ambulance to the hospital, she and her daughter following in their car. They arrived about noon and he was taken on a stretcher to a room on the second floor and put on a bed near the window. She and her daughter remained with him until about 2:00 P. M., when they went home for a little rest.

They came back about 6:30 P. M., and her husband was not in his room. The bed was torn up, all the bedding off; the urinal under the bed had been turned over and was gone; the doorstop had been knocked off; one of his slippers was on one side of the room and the other on the other side; the window screen was not fastened; and his pajama coat was found with the sleeve torn open.

After some inquiries they learned from the nurses that Mr. Anderson had just fallen or jumped out the window of his room, and had been picked up, and taken to the surgery room where his wounds and injuries were then being treated by doctors on the hospital staff.

The only evidence as to the immediate circumstances of the injury comes from defendant's witnesses. It shows they did not follow Dr. Schuler's orders to put the patient on a low bed and use sideboards, and to use restraints, if necessary, to keep him in bed. At about 2:30 P. M. he was "irrational. Dropping cigarettes everywhere. * * * smoking cigarettes and dropping ashes and embers on the beds." (Chart Ex. 2, pp. 8, 14-15.)

He was getting out of bed, walking around, going into rooms of other patients, wandering about—"out in the halls and making a nuisance of himself." He was suffering from fears and delusions—thought he had a telegram

from his father, who had been dead twenty years, feared he was going to be operated on and wanted to call a taxicab to get away. His chart recorded: "3:30: Pt. confused. States he has a telegram from his father. Pt. wants a taxi called. Suspects an operation." (Ex. 2, p. 15.)

About 4:00 P. M. Mrs. Mattison, nurse supervisor, called Dr. Bowes, one of defendant's medical staff, and told him "the patient was smoking in his room and dropping ashes and embers on bed clothes." He told her the patient could not smoke unless attended. Later she called and told him the patient was out of bed, walking around in the hall, going into other rooms looking for cigarettes, disturbing other patients—"she gave the picture generally that the floor couldn't handle him." It was obvious he needed a special nurse or attendant, and Dr. Bowes told her to get a special attendant for the patient.

But she went off duty about that time, Dr. Bowes' order was not carried out, and no special nurse or attendant was provided for the patient. He seemed to grow progressively worse. He kept on getting out of bed, wandering up and down the halls, going into other rooms, suffering under his fears and delusions, wanting to get away, walking up to the walls, talking, imagining he was telephoning for a taxicab. So about 6:00 P. M. Dr. Gant, the Medical Director of the hospital, was called to see the patient.

But nothing was done for him—nothing to relieve him, or keep him in bed, or provide a special attendant for him. He continued wandering around trying to get out, and was injured about 6:30 P. M. The hospital chart says: "25 to 7. I checked the Pt.—B. Johnson. 6:35. Nurse heard pt. hit the ground—C. Hedges." (Ex. 2, p. 14.) It appears that B. Johnson was a male nurse who picked

up the patient soon after he fell or jumped out the window. Johnson, however, was not called as a witness.

This nurse, Mrs. Clara Hedges, was called as a witness for defendant, and she testified that she was eating her supper in the room next to the patient's room; that she heard him walking out in the hall, heard another nurse tell him to go back into his room, heard him walk into his room, and in "a few seconds" heard the window screen slam to and "a dull thud, a dead fall"; and that she looked out her window and saw the patient on the ground beneath the window of his room.

He was taken to the surgery or operating room and treated by doctors on the hospital staff. But nothing could be done for him. Besides other injuries received when he struck the ground, he had a fracture of the skull, a concussion and massive hemorrhage of the brain, and he was unconscious and in a coma. He died seven days later without ever regaining consciousness.

Such were the circumstances of the case for plaintiff. We think they were sufficient to raise a duty upon defendant to use reasonable care to protect this patient against the danger of his getting out of bed and harming himself, and to make it a question for the jury whether defendant breached this duty and was guilty of negligence which proximately caused the death sued for.

A private hospital owes a duty to give its patient such reasonable care and attention for his safety as his physical and mental condition may require; and it must use reasonable care to safeguard him against any known or reasonably apprehended danger to himself due to his mental derangement. Wetzel v. Omaha Maternity & General Hospital Association, 96 Neb. 636, 148 N. W. 582, Ann. Cas. 1915B, 1224; James v. Turner, 184 Tenn. 563, 201 S. W. (2d) 691; O'Quin v. Baptist Memorial

Hospital, 184 Tenn. 570, 201 S. W. (2d) 694; Spivey v. St. Thomas Hospital, 31 Tenn. App. 12, 211 S. W. (2d) 450; Tate v. McCall Hospital, 57 Ga. App. 824, 196 S. E. 906; Robertson v. Charles B. Towns Hospital, 178 App. Div. 285, 165 N.Y.S. 17; Harbison, The Standard of Care Owed by a Hospital to its Patients, 2 Vand. L. Rev. 660-674.

Here Anderson's condition was known to the hospital's employees. Dr. Adams had told them he was deranged and might harm himself if not put on the ground floor and watched. Plaintiff had told Dr. Schuler his condition, and the doctor had left instructions to put him on a low bed, use sideboards, and use restraints if necessary. But these instructions were not carried out.

For hours before the accident the patient was "irrational," "confused," wandering around in the halls and other rooms, under delusions and fears, and wanting to escape. The nurse supervisor called Dr. Bowes twice, saying "the floor couldn't handle him." It was "obvious" to her he needed a special nurse or attendant. Dr. Bowes said he needed a special attendant and told her to get one. Dr. Schuler said he needed "special nurses—a nurse right around the clock, one every eight hours."

Thus defendant's servants and employees realized he was in such danger from his delirium and delusions as to need a special attendant to safeguard him from getting out of bed and harming himself. But despite this danger it failed to get such attendant or someone to watch him, but left him unprotected on the second floor near this window which was unguarded and not securely fastened.

In these circumstances some such harm as that which actually befell the patient may "well have been foreseen," or so the jury could reasonably find. Wetzel v. Omaha

Maternity & General Hospital Association, supra, 96 Neb. 636, 641, 148 N. W. 582, 584, Ann. Cas. 1915B, 1226.

It is a matter of common experience that delirious patients often fall or jump out of upper story windows of hospitals; and there are numerous cases holding hospitals liable in circumstances not materially different from those in this case. Wetzel v. Omaha Maternity and General Hospital, supra; Santos v. Unity Hospital, 301 N. Y. 153, 93 N. E. (2d) 574, 575; Spivey v. St. Thomas Hospital, supra, 31 Tenn. App. 1229, 211 S. W. (2d) 450, and cases there cited. See cases in annotations: 24 A. L. R. 347, 39 A.L.R. 1433, 124 A.L.R. 195, 11 A.L.R. (2d) 782-784, 791-794.

Defendant contends, however, that it was not possible for its regular nurses and attendants to give full time supervision or attention to any one patient; that plaintiff was told she should get a special nurse for the patient but declined to do so; that its regular nurses and attendants gave him all the care and attention possible; and that, therefore, it could not be found negligent.

Plaintiff denied she was told she should get a special nurse. But if she was, and did not get one, this would not relieve defendant from its duty to see that this patient who was in extremis was given such attention as his condition apparently rendered necessary for his protection. Durfee v. Dorr, 123 Ark. 542, 186 S. W. 62; 26 Am. Jur., Hospitals and Asylums, Sec. 14, p. 596; Annotations: 22 A.L.R. 345, 124 A.L.R. 190.

Defendant claims that its witness Dr. Gant made out a complete defense for it, and it was entitled to a directed verdict on his testimony.

Dr. Gant said he was acting, not as defendant's medical director, but as the patient's physician; that the nurses called him for instructions how to handle the patient; that he found the patient rational and sitting quietly on

the bed; and that he considered two things; whether to remove the patient from the surgical to the medical wing, or to tie him in bed, and reached a "medical decision" not to do either.

Defendant contends that this was a matter involving expert knowledge and professional skill; that this judgment thereon by Dr. Gant, as attending physician, even though erroneous, was final and conclusive; and that defendant's nurses and attendants could not be found negligent for following this medical decision of the patient's physician.

■ This testimony cannot excuse defendant. By all the other proof the patient was so "irrational" that the nurses "couldn't handle him," and it was "obvious" that he needed a special attendant. It is a matter of common knowledge and common sense of laymen that a patient in such a condition should be watched and protected and not left unattended on an upper story by an unguarded window through which he might, and ultimately did, fall or jump to his death.

■ A similar excuse, based on instructions of the patient's physician, was rejected in the leading case of Wetzel v. Omaha Maternity and General Hospital, supra. It was there said: "Duties which a hospital as such owes to a patient cannot be evaded by proof that the hospital nurse obeyed the instructions of the physician employed by him. Nurses necessarily have charge of delirious patients during the absence of physicians, while the responsibility of the hospital continues." 148 N. W. 582, 583, Ann. Cas. 1915B, 1226.

Moreover, the testimony of this witness cannot be taken to be true, as a matter of law, for the purpose of a directed verdict. A reading of it will show that this doctor testified, not as a frank and unbiased expert, but as an

interested and argumentative partisan; and he was impeached and contradicted in many material and important matters. The jury reasonably might, and doubtless did, reject his testimony.

The argument is made for defendant that plaintiff and her daughter selected the room that was given the patient on the second floor; that they were told they should employ a special nurse for him but declined or failed to do so, knowing that defendant's regular floor nurses and attendants could not give him full time attention or constant supervision; and that they were, therefore, guilty, as a matter of law, of contributory negligence barring this action.

We think there was no evidence that they were guilty of any negligence that contributed to cause the death sued for; the defendant held out the Madison Sanitarium and Hospital as an institution equipped to receive mental patients and to give them the proper treatment and care. It accepted Anderson as such a patient and its employees promised to give him proper care. Plaintiff and her daughter had a right to rely on these assurances and to entrust the patient to defendant's care, and were not negligent in doing so.

They did not select the room for him. When the nurse started to put him in a ward with three other patients they objected and said they wanted a private room for him; but the nurse selected the room and had him taken to it on the ambulance stretcher. He had been put on the ground floor before and they did not notice that this room was not on that floor. He had been properly cared for before and they thought he would be again. The fact that they did not employ a special nurse did not make them negligent or excuse defendant from its negligence. 26 Am. Jur., Hospitals and Asylums, Sec. 14, p. 596.

Defendant has assigned numerous errors upon the judge's charge to the jury, complaining of instructions given and requested instructions refused. Without setting out the excerpts on which the assignments are based, we think none of them is well taken. Upon full consideration of each of them, we find no harmful error in any of them.

Finally, defendant complains of the amount of the verdict. It is argued that Anderson was suffering from a number of ailments—emphysema, heart disease, and a stomach ulcer—and was practically a dying man when he was brought to the hospital; and that the verdict is so excessive that it should be reduced by remittitur.

It is true that he might have died of his ailments even if he had not had this accident. It is likewise true that he might have recovered from them, regained his health, lived out a normal expectancy of a man of his age, enjoying his former earning capacity. Such expectancy would have been some fourteen years and his earnings before he became ill had been about a $1,000 per month, he being a successful real estate salesman.

The jury were properly instructed to consider the state of his health and all other revelant factors. It was for the jury to balance the probabilities in forming an estimate of the damages. This is much the same thing which the jury has to do in any action for damages for wrongful death. The uncertainties inherent in the process are no objection against it.

A much larger verdict would have been allowable if the patient had been in good health. The amount allowed by the jury would indicate that they took into consideration his state of health, expectancy, and other relevant factors in estimating the damages. We cannot

say that the amount of their verdict, which received approval of the trial judge, is so excessive that we should suggest a remittitur to reduce it.

All of the assignments of error are overruled. The judgment of the Circuit Court is affirmed and a judgment will be entered here for plaintiff against defendant for the amount of the judgment below with interest. The costs of the appeal in error are adjudged against defendant and the surety upon its appeal bond.

Howell and Hickerson, JJ., concur.