Ellen T. WEATHERS,
Plaintiff–Appellant,

v.

Dr. Robert D. PILKINTON,
Defendant–Appellee.

Court of Appeals of Tennessee,
Middle Section, at Nashville.

March 23, 1988.

Permission to Appeal Denied by
Supreme Court June 27, 1988.

H. Michael Bennett, Schulman, Leroy &
Bennett, P.C., Nashville, for plaintiff-appellant.

Ed R. Davies, Davies, Cantrell, Humphreys & McCoy, Nashville, for defendant-appellee.

## OPINION

CANTRELL, Judge.

In this action for wrongful death against a doctor who allegedly failed to take the proper steps to prevent his patient from taking his own life, the trial judge held that the suicide of the defendant was an independent intervening cause and directed a verdict for the defendant. We affirm, on a related, although slightly different, ground.

The decedent, Michael Weathers, was born on November 6, 1955 and married the plaintiff, Ellen Weathers, on March 5, 1982. Mrs. Weathers gave birth to a son, Michael Houston, who was born on July 27, 1983.

At Christmas of 1983 the decedent made his first overt reference to his death when, during an argument with the plaintiff, he pulled a gun from the drawer and invited the plaintiff to shoot him. In March of 1984, when his wife was out of town, the decedent called her long distance to tell her he had just taken an overdose of codeine. Fortunately, he regurgitated the codeine and when the plaintiff arrived home the next day he was all right. On Easter Sunday of 1984 the decedent got into an argument with the plaintiff and again invited her to kill him with a knife. Following that event he entered the Vanderbilt Hospital where he stayed for two weeks under the care of Dr. Robert Jack, a psychiatrist. Dr. Jack dismissed the decedent from the hospital and prescribed Elavil for his depression and referred him to the Luton Mental Health Center for outpatient consultation. For a time Mr. Weathers' condition improved but he cut back on his medicine and his depression and paranoia returned.

Mr. and Mrs. Weathers separated in late August of 1984, after arguing about an incident in which the decedent had gone to scout a field for dove hunting and left the plaintiff and their sick child at home without any transportation. On September 14, 1984 Mr. Weathers took an overdose of Elavil and was admitted to Memorial Hospital in Nashville under the care of the defendant, Dr. Robert D. Pilkinton. Mr. Weathers had apparently attempted to commit suicide since he had left a suicide note behind. Dr. Pilkinton stated to members of the family that he could treat Mr. Weathers' medical condition but that psychological problems were out of his (Dr. Pilkinton's) field.

After a period in intensive care and a total of eight days in the hospital Mr. Weathers was discharged. On November 7, 1984 he apparently took another overdose of drugs and left a suicide note. Mrs. Weathers and his sister were able to rouse him but for a time he had hallucinations and appeared disoriented.

On November 10, 1984 Mr. Weathers again took an overdose of drugs and was taken unconscious to Memorial Hospital. He stayed overnight in Dr. Pilkinton's care but demanded to be released the next morning. Although Mrs. Weathers and other members of the family requested Dr. Pilkinton to commit Mr. Weathers involuntarily, the doctor released him and urged him to return to the Luton Mental Health Clinic for treatment.

After his release from the hospital on November 11, 1984 Mr. Weathers begged his wife to return to live with him, and he returned to his mother's home where he lived for the next seventeen days in an apparently normal manner. He went back to work, he drove a car, he went hunting once or twice, and he attended a family gathering with his son at Thanksgiving. He was in a good mood, appearing to be more friendly and talkative than he had been in the recent past.

On November 16, 1984 the plaintiff, Ellen Weathers, consulted an attorney and signed a complaint for a divorce. On November 17 she told Mr. Weathers that she had commenced the divorce action but that if he would seek help they could be remarried.

On November 28 Mr. Weathers went to work as usual. After work he expected the plaintiff to bring the family car over to his mother's house for him to do some work on it. Mrs. Weathers did not keep the appointment because their child was upset, but the parties had several telephone conversations. In one of the conversations Mr. Weathers told Mrs. Weathers that he intended to shoot himself. Mrs. Weathers tried to keep him on the telephone but Mr. Weathers apparently carried out his threat before the members of the family or the police arrived.

The plaintiff, Ellen Weathers, brought this action against Dr. Pilkinton. The complaint contains two counts. The first count is for the wrongful death of Michael Weathers under our wrongful death statute, Tenn. Code Ann. § 20-5-110. The second count is for the tort of outrageous conduct and is brought on behalf of Mrs. Weathers personally. Under the first count the plaintiff alleged that the negli-

gence of Dr. Pilkinton was the proximate cause of Mr. Weathers' death.

At the trial the plaintiff presented two expert witnesses. They testified that to fulfill the standard of care in effect in the Nashville area, Dr. Pilkinton should have committed Mr. Weathers involuntarily on November 11, 1984 and should have ordered a psychiatric evaluation of Mr. Weathers after the three recent suicide attempts. In addition the experts testified that it was a mistake for Dr. Pilkinton to order Mr. Weathers to return to Luton Mental Health Center for outpatient care since his previous experience there had proved unsuccessful. Finally, each expert testified that in his opinion Dr. Pilkinton's negligence was the proximate cause of Mr. Weathers' death.

At the close of the plaintiff's proof the trial judge directed a verdict in favor of Dr. Pilkinton on both counts. On the negligence count the trial judge held that Mr. Weathers' suicide was an intervening intentional act that proximately caused his death. (Therefore, assuming that Dr. Pilkinton deviated from the standard of care, his negligence could not constitute the proximate cause of the death of Mr. Weathers.) On the second count, the trial judge held that there was simply no evidence of an intentional infliction of emotional distress on Mrs. Weathers which is a necessary element of the tort of outrageous conduct.

## THE OUTRAGEOUS CONDUCT ACTION

■ We affirm the directed verdict on the outrageous conduct count. As the Supreme Court said in *Medlin v. Allied Investment Co.*, 217 Tenn. 469, 398 S.W.2d 270 (1966), the tort of outrageous conduct involves two factors: (1) the conduct of the defendant must have been outrageous, the type of conduct not tolerated in a civilized society, and (2) as a result of the outrageous conduct there must have been serious mental injury. *Id.* at 479, 398 S.W.2d at 274. In commenting on this cause of action the courts have also in spoken in terms of the wilful and reckless infliction

of "mental and emotional injury, humiliation and shock." *Moorhead v. J.C. Penney Co., Inc.*, 555 S.W.2d 713, 718 (Tenn.1977). *See also Holt v. American Progressive Life Insurance Co.*, 731 S.W.2d 926 (Tenn. App.1987).

The facts of this case simply do not warrant a finding that Dr. Pilkinton's conduct was outrageous nor a finding that as a result of his conduct Mrs. Weathers suffered the type of severe emotional distress that is a necessary element of the tort.

## THE WRONGFUL DEATH ACTION

In reviewing the action of the trial judge in directing a verdict in favor of Dr. Pilkinton, we are obliged to view the evidence in the light most favorable to the plaintiff, *McDonald v. Dunn Const. Co.*, 182 Tenn. 213, 216, 185 S.W.2d 517, 518 (1945), indulge all reasonable inferences in favor of the plaintiff, and disregard all evidence to the contrary. *Westbrook v. Illinois Central Gulf Railroad*, 688 S.W.2d 453, 455 (Tenn.App.1985).

■ There is evidence in the record from which the jury might find that Dr. Pilkinton was negligent in treating Mr. Weathers. Although Dr. Pilkinton attacks the qualifications of the plaintiff's witnesses to give their opinions as to the standard of care in this locality, the trial judge held that they were qualified. That decision is entitled to great weight. *Thomas v. Harper*, 53 Tenn.App. 549, 561, 385 S.W.2d 130, 136 (1964). From an examination of the record concerning the qualifications of the plaintiff's expert witnesses we are satisfied that the trial judge did not abuse his discretion in approving their qualifications. Therefore, for the purpose of ruling on the motion for a directed verdict, we assume that the trial judge was correct.

If there is evidence from which the jury could have concluded that Dr. Pilkinton was negligent, the sole remaining question is whether there is evidence from which the jury could have concluded that the alleged negligence of Dr. Pilkinton was the proximate cause of the death of the decedent. As our Supreme Court said in *Lancaster v. Montesi*, 216 Tenn. 50, 390 S.W.2d 217

(1965), the cases in this jurisdiction and elsewhere have generally held that an act of suicide breaks the chain of causation unless the decedent's reason and memory were so far obscured that he did not know and understand what he was doing and was not therefore a responsible human agency. *Id.* at 60, 390 S.W.2d at 222. In *Lancaster* the Supreme Court sustained a demurrer even though the declaration alleged that the defendant had deliberately tormented the decedent in a most sadistic way and that, despite the decedent's threats of and prior attempts at suicide, the defendant continued to abuse her unmercifully. The court concluded that although the declaration alleged that the decedent was "bereft of reason" it could not be said that she did not know and understand the nature of her act. *Id.*

In *Jones v. Stewart*, 183 Tenn. 176, 191 S.W.2d 439 (1946), a young man committed suicide after being accused of burglarizing a neighbor's home. The declaration alleged that the accusation was made without probable cause and that as a consequence the young man was so shocked and frightened that he was unable to endure the shame. Nevertheless, the court held that the intervening act of the deceased and not the tort of the defendant was the sole proximate cause of death. *Id.* at 181, 191 S.W.2d at 441. The court quoted the following excerpt from *Daniels v. New York N.H. & H.R. Co.*, 183 Mass. 393, 67 N.E. 424 (1903): "An act of suicide resulting from a moderately intelligent power of choice, even though the choice is determined by a disordered mind, should be deemed a new and independent, efficient cause of the death that immediately ensues." 67 N.E. at 426.

■ From this line of cases we conclude that where a defendant injures another either wilfully or negligently and as a result of the injury, the injured person commits suicide the act of suicide is, as a matter of law, an intervening independent cause if the decedent knew and understood the nature of his or her act or the act resulted from a moderately intelligent power of choice.

The appellant does not contest the rule established in *Jones* and *Lancaster*, but instead argues that there is a different rule where the decedent is under the care of a health care provider and consequently the health care provider has a specific duty of care to the patient. We acknowledge that there is a difference and—since proximate cause is based on forseeability—that the fact that mentally ill persons might take their lives if adequate precautions are not taken to protect them from themselves is more forseeable than the fact that a person injured by an ordinary act of negligence might become so depressed that suicide would result. *See* Annot., 17 A.L.R. 4th 1128 (1982).

■ However, we must recognize that this is still an action for wrongful death and the right that survives to the widow is the same cause of action the decedent would have had had he survived. *Hance v. Haun*, 216 Tenn. 176, 179, 391 S.W.2d 621, 622 (1965); *Oman v. Delius*, 162 Tenn. 192, 200, 35 S.W.2d 570, 573 (1931); *Sharp v. Cincinnati N.O. & T.P. Ry. Co.*, 133 Tenn. 1, 9, 179 S.W. 375, 377 (1915). Thus, if the decedent could not have sued no right survives. *McCreary v. Nashville C. & St.L. Ry.*, 161 Tenn. 691, 696, 34 S.W.2d 210, 211 (1931).

■ Can we say that an action for wrongful death may be maintained where the decedent himself ended his life in a deliberate, calculated, and voluntary act of suicide; where he had "an understanding of the physical nature and effect of his act, and ... a wilful and intelligent purpose to accomplish it"? *Daniels v. New York N.H. & H. Ry. Co.*, 183 Mass. 393, 67 N.E. 424, 426 (1903). In such a case the decedent himself would not have had a cause of action against his doctor for his own (the decedent's) voluntary act. Consequently, no cause of action would pass to the surviving spouse.

The rule is otherwise, of course, where the decedent did not know the nature or consequences of his act, or his reason and memory where, at the time, so far obscured that he did not know and understand what he was doing and was therefore not a re-

sponsible human agency. *See Spivey v. St. Thomas Hospital*, 31 Tenn.App. 12, 24, 211 S.W.2d 450, 455 (1947); *Eckerd's, Inc. v. McGhee*, 19 Tenn.App. 277, 287, 86 S.W.2d 570, 575 (1935). Under those circumstances the act of suicide would not be a wilful, calculated, deliberate act that would defeat an action for wrongful death.

Therefore, we are of the opinion that the result in this case turns on the question of whether there is evidence in the record from which the jury might conclude that on the date of his death Mr. Weathers did not know and understand the nature of his suicidal act and, therefore, did not have a wilful and intelligent purpose to accomplish it. The only evidence in the record tending to show that Mr. Weathers did not know and understand the nature of his acts on November 28, 1984 is the circumstantial evidence of his history of depression, his treatment, and his prior suicide attempts. Neither of the medical experts who testified on behalf of the plaintiff testified that Mr. Weathers was bereft of reason or that he did not know and understand what he was doing.

On the other hand, the overwhelming evidence shows that from November 11 until November 28, 1984, Mr. Weathers functioned normally and lived an unremarkable life. Viewing the evidence in the light most favorable to the plaintiff, we are of the opinion that there is no evidence from which the jury could conclude that Mr. Weathers was, on November 28, 1984, in such a state of anxiety or depression that he did not know what he was doing. Therefore, the trial judge was correct in directing a verdict for the defendant.

The judgment of the court below is affirmed and the cause is remanded to the Chancery Court of Davidson County for any further necessary proceedings. Tax the costs on appeal to the appellant.

TODD, P.J., concurs.

TATUM, Special Judge, dissenting:

I agree with the majority in the dismissal of the outrageous conduct action, but must respectfully dissent from the majority opinion affirming the action of the Trial Court in directing a verdict for the defendant in the negligence action. In my view, a jury question was presented.

I agree with the majority that there was evidence of negligence on the part of the defendant. I disagree that such negligence could not be found by a jury to be the proximate cause of the death of the decedent. I would distinguish this case from *Lancaster v. Montesi* and *Jones v. Stewart*, cited by the majority.

The history of the previous attempts of the decedent to commit suicide is strong evidence that he was afflicted with a mental illness that caused suicidal compulsions. It was for this reason that the decedent was placed in the care of the defendant, a health provider. It was the duty of the defendant to attempt to prevent the decedent from committing suicide.

In *Adams v. Carter County Memorial Hospital*, 548 S.W.2d 307 (Tenn.1977), our Supreme Court cited, with apparent approval, a treatise in 24 Vanderbilt Law Review, 217 (1971) entitled "Civil Liability for Causing Suicide: A Synthesis of Law and Psychiatry." I quote from this treatise:

"Hospitals and psychiatrists may be charged with an affirmative duty to prevent their patients from committing suicide....

First, it seems clear that liability could be imposed upon a psychiatrist for a gross error in judgment with respect to whether a patient should be confined. Giving full ambit to psychological justifications for not confining patients unless absolutely necessary, suicidal symptoms may be so apparent that confinement would be ordered by a psychiatrist of ordinary skill. For example, if an individual has made serious suicidal attempts, has been deeply depressed, has suffered loss of sleep, appetite, and in effect is almost unable to function in society, but his psychiatrist has declined to have him placed in a hospital, the psychiatrist might be held liable for the individual's subsequent suicide.

In *Bell v. New York City Health and Hospitals Corp.*, 90 A.D.2d 270, 456 N.Y. S.2d 787 (1982), the Supreme Court of New York was confronted with the identical question with which we are faced. The New York Court rejected the physicians' argument that a suicide was an independent, intervening cause unrelated to his pre-existing negligence, stating:

"In our view, the proof on the question of causation was sufficient to submit the issue to the jury. Plaintiff's expert testified that the premature discharge of the patient was a contributing factor in the attempted suicide, which was viewed as being part of a continuing psychotic process. In other words, the attempted suicide was a product of the illness for which John Bell was negligently treated, and his premature release from the hospital. Furthermore, the defendants were clearly in a position to prevent the 'avoidable' mistake had proper care been exercised. Bell only had the burden to establish that the premature discharge was a substantial contributing factor of his injuries. He was not obligated to exclude other potential causes. The jury could either reject or accept the physician's opinion that the negligent release of plaintiff John Bell was a proximate cause of the suicide attempt."

I also agree with the New Jersey Superior Court in *Cowan v. Doering*, 215 N.J.Super. 484, 522 A.2d 444 (1987). In that case, a physician admitted a depressed patient to intensive care, who had taken an overdose of sleeping pills. The physician failed to take suicidal precautions. The patient subsequently attempted suicide by jumping from the hospital window. At trial, the physician took the position that the patient understood and appreciated the consequences of her acts and therefore her suicidal attempt was an independent intervening cause. In rejecting this defense and upholding a jury verdict, the New Jersey court stated:

"Observation has particular efficacy where, as here, the duty of the physician and the hospital encompasses the responsibility to safeguard the patient from the reasonably foreseeable risk of self-inflicted harm.

We find no sound reason to adopt the sterile and unrealistic approach that if a disabled plaintiff is not totally incompetent, he is fully legally accountable for his own negligence. In view of the present state of medical knowledge, it is possible and practical to evaluate the degrees of mental acuity and correlate them with legal responsibility. In our view, a patient known to harbor suicidal tendencies whose judgment has been blunted by a mental disability should not have his conduct measured by external standards applicable to a normal adult. Where it is reasonably foreseeable that a patient by reason of his mental or emotional illness may attempt to injure himself, those in charge of his care owe a duty to safeguard him from his self-damaging potential. This duty contemplates the reasonably forseeable occurrence of self-inflicted injury regardless of whether it is the product of the patient's volitional or negligent act."

Also see *Tabor v. Doctor's Memorial Hospital*, 501 So.2d 243 (La.App.1987).

The Tennessee Supreme Court has not directly dealt with the question here involved in a suit against the physician but it has recognized exceptions to the *Lancaster* and *Jones* cases in suits against hospitals. I see no distinction in a suit against a hospital and a suit against a physician.

In *James v. Turner*, 184 Tenn. 563, 201 S.W.2d 691 (1941), the following general rule was enunciated by our Supreme Court:

"Voluntary submission to the authority of the sanitarium raises an implied obligation on its part to give the patient such reasonable care and attention for his safety as his mental and physical condition require. When a patient enters a hospital maintained for private profit, he is entitled to such reasonable attention as his safety may require, and, if he is temporarily bereft of reason and is known by the hospital authorities to be in danger of self-destruction, the authorities are duty bound to use reasonable care to prevent such an act."

In *Spivey v. St. Thomas Hospital,* 31 Tenn.App. 12, 211 S.W.2d 450 (1947), a wrongful death action was brought against the hospital for its negligence in the care and treatment of a patient who jumped from a hospital window, committing suicide. The hospital argued that the patient's act of jumping out of the window was altogether unforeseeable, that it was an independent intervening cause, and that the hospital could not be charged with negligence for not forseeing and guarding against such an act. In rejecting this argument, this Court said:

"If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.

So the particular harm which actually befell Spivey (the patient) need not have been foreseeable. It is enough that such harm of a like general character was reasonably foreseeable as a likely result of defendant's failure to use due care to keep him in bed and to protect him against getting out of the window in his delirium.

But quite apart from this view of the case, we think the jury could well have found that his act was not so unusual or extraordinary as to be beyond the range of reasonable expectation; but that it was a thing which might reasonably have been expected to occur in view of his condition. Common experience shows that patients in such condition often jump or fall out of upper story windows of hospitals. Such cases are numerous in the reported decisions."

For like holdings see *Rural Education Association v. Anderson,* 37 Tenn.App. 209, 261 S.W.2d 151 (1953); *Slaten v. Earl Campbell Clinic Hospital,* 565 S.W.2d 483 (Tenn.1978).

In my view, suicide is not an intervening independent cause that will relieve a physician of liability or negligence when the patient had no power of choice. There was evidence in this case that the decedent acted with compulsion and not through a power of choice. Even in criminal cases, a defense of insanity is good even when the accused has substantial capacity to appreciate the wrongfulness of his conduct when, due to mental illness, he does not have the capacity to "conform his conduct to the requirements of law." *Graham v. State,* 547 S.W.2d 531 (Tenn.1977). By analogy, I would hold that even if the decedent knew and understood the nature of the suicidal act, the physician would not be relieved of liability if the decedent acted through compulsion and not by an "intelligent power of choice." As stated, the history of the decedent's previous attempts to commit suicide is circumstantial evidence sufficient to make a jury question as to whether the suicide was committed by "intelligent power of choice" or by compulsion due to mental illness. I repeat that this suicidal tendency or compulsion was specifically the ailment which the defendant was entrusted to treat.

I also disagree with the majority that the decedent could not have maintained this action had death not ensued. In view of the aforesaid evidence that the decedent ended his life by compulsion due to mental illness, it cannot be said, as a matter of law, that the suicide was "deliberate, calculated, and voluntary" with an "understanding of the physical nature and effect of his act, and a willful and intelligent purpose to accomplish it." This question was for the jury. See generally, *Stokes v. Leung,* 651 S.W.2d 704 (Tenn.App.1982). I put little significance to the fact that the decedent went for 17 days after his discharge without committing suicide. It is common knowledge that people suffering with an illness such as the decedent do not generally attempt suicide, hourly, daily, or perhaps even weekly. In any event, this would be a circumstance to be considered by the jury and not this court.

I have a high respect for the opinions of my colleagues. However, I would reverse the judgment of the trial court and remand the case for trial on the negligence issue.