Noel W. BROWN, Executor of the Estate of Myrtle Brown and Noel W. Brown, Individually, Plaintiffs-Appellants,

v.

UNIVERSITY NURSING HOME, INC., Defendant-Appellee.

Court of Appeals of Tennessee, Middle Section.

Dec. 1, 1972.

Certiorari Denied by Supreme Court April 2, 1973.

W. A. Moody, Jr., Philip M. Carden, Nashville, for plaintiffs-appellants.

Wm. H. Woods, Robt. E. Parker, Goodpasture, Carpenter, Woods & Sasser, Stanley T. Snodgrass, Nashville, for defendant-appellee.

## OPINION

SHRIVER, Judge.

This is an appeal in two consolidated cases from judgments entered on jury verdicts for the defendant Nursing Home. The original suit was brought by Mrs. Myrtle Brown, an aged patient at the University Nursing Home, Inc., to recover for injuries received when she fell on the premises of the defendant. A companion suit was brought by her husband, Noel W. Brown, for expenses, etc., of his wife resulting from the fall. Mrs. Myrtle Brown died before the trial and her suit was revived in the name of her husband, Noel W. Brown, as Executor of her estate.

As above indicated, after a trial to a jury, there was a verdict and judgment in favor of the defendant in each case, from which judgment an appeal was duly perfected and assignments of error filed.

The original declarations were in one count each alleging breach of the contract between plaintiffs and the defendant, which contract is marked "Plaintiffs' Exhibit 1", and which was signed by a representative of the Nursing Home and Noel W. Brown for the patient.

It is alleged in the declaration that Mrs. Myrtle Brown was accepted as a patient by the defendant in September of 1970 when, because of her age and physical infirmity, she became unable to properly care for herself. Her husband, because of his advanced age, was also unable to provide properly for her; that, under the contract in question, it was agreed that the defendant would provide such personal services as might be required for the health, safety and well-being of plaintiff, Myrtle Brown; that on November 14, 1970 the defendant breached its duties as set forth in the aforesaid contract, as a result of which breach the plaintiff, Myrtle Brown, fell and broke her hip; and that, as a result of said fracture, she was permanently incapacitated and bedridden.

The declaration was subsequently amended to add Count Two wherein it was alleged that when plaintiff, Myrtle Brown, was admitted to the University Nursing Home, it was done with the knowledge and understanding on the part of the defendant that the plaintiff was incapable, mentally and physically, of caring for herself because of advanced arteriosclerosis.

It is further averred that plaintiff was placed in a chair which was either defective or inadequate to restrain her and that the restraining tray, which was a part of the chair, became dislodged, allowing plaintiff to attempt to walk, which resulted in the fall wherein her hip was fractured, and that said injury was the direct and proximate result of the negligence of the defendant and its agents.

Defendant filed a general issue plea of not guilty.

## THE FACTS

The Contract, Plaintiffs' Exhibit 1, provides, in pertinent part, as follows:

"1. To furnish room, board, laundered linens and bedding, nursing care, and such personal services as may be required for the health, safety, good grooming, and well-being of the patient."

The record shows that Mrs. Myrtle Brown was eighty-two years of age at the time she was admitted to the Nursing Home on September 26, 1970, and that on November 14, 1970, at approximately 11:00 o'clock A. M., she fell and fractured her hip.

Mrs. Ruth Spears who had been employed as a nurse at the defendant Nursing Home for about nine years, testified, among other things, that as a part of her duties she looked after Mrs. Myrtle Brown. When asked as to Mrs. Brown's condition insofar as mentality or senility was concerned, she answered: "Well, she seemed to be very cooperative, you know," and

stated that her mental condition was not any worse than that of other patients at the Nursing Home. When asked what orders she had been given by Dr. Gupton, the attending doctor, she stated: "Well, her orders was to, you know, have her up and walk her, which we did."

She was further asked and answered:

"Q. All right. Was there any order of any type, shape, form or fashion in regard to any restraint that would be put on her?

A. No, sir.

Q. Is it the obligation of the Nursing Home to carry out the attending physician's instructions and orders?

A. Yes, sir."

She further testified that, from the time Mrs. Brown entered the Nursing Home, it had been the practice to put her in a chair at some time during each day, and the witness stated:

"Well, the rules were, we would give them their baths and get them up in the chairs, and then, after lunch, we would put them back to bed."

She further stated:

"Well, a lot of times, we would roll her in the lounge, you know. She would sit in the lounge with the other patients."

The witness was asked if she had seen Mrs. Brown on the morning of the accident and she answered that she had and, when asked about her mental condition and general condition, she answered: "She was very calm. She talked with us." She then stated that there was nothing unusual about her conduct and that, on the day in question, Mrs. Brown had sat up in the hall in front of the Nurses Station in a chair. She also stated that the Nurses Station where Mrs. Brown sat was right next door to her room. When asked when she last saw Mrs. Brown before the accident, she testified that she had accompa-

nied Mrs. Brown to the bathroom, which was in her room, and then brought her out and put her back in her chair, which she described as being similar to a baby's high chair, that is, it was equipped with a tray which could be used when the patient was being given her meals.

Mrs. Spears further testified:

"Q. Did you put her in the chair?

A. I helped her in with the other nurse, and we fastened it. I fastened the chair and told her we were going to have lunch and then, I went down to the other end of the hall to get another patient to walk, you know, up the hall for, I guess two, or, you know, three minutes, something like that, and then, when I came back, I just checked in and she was sitting on the floor.

Q. In what position was she sitting?

A. Well, something like I'm sitting, like this, kind of leaning up against, you know, the foot of the bed, the side of the bed."

She testified that she then called for help and Mrs. Woodard was there very shortly and assisted in putting her in bed and, afterwards, she fed her her lunch, which she ate.

Miss Charlotte Barber, the Administrator of defendant Nursing Home, who was not present at the time of the accident in question but who arrived later, testified about the general operation of the Nursing Home and about the chair in which plaintiff was seated prior to her fall. She stated that the chair in question was a standard geriatric chair purchased from a reputable surgical supply house and was the type of chair generally being used in Nursing Homes in Nashville and that, although the bib, or tray, on the chair could be removed, it was generally used as a mild form of restraint for patients, such as Mrs. Brown, and that there had been no indication prior to the time Mrs. Brown fell that

she might attempt to get out of her chair or that it would be necessary to restrain her and, further, that Mrs. Brown's doctor, Dr. Gupton, had not ordered any type of restraint for Mrs. Brown at anytime prior to her fall, but, on the contrary, had advised that she be encouraged to move about and to walk. In answer to the question: "Could she on her own get up and walk," she replied: "She could ambulate on her own," although she did not recall Mrs. Brown getting up out of bed without help.

Certain charts which were kept with regard to the patient were introduced and read from, and Miss Barber was asked to read the comments on the charts about Mrs. Brown's condition on the evening prior to her injury and up to the last note made on her injury on November 14th. She then read:

"On the 13th, seven to three, a. m., care, diet, ate well, ambulated to bathroom, out in the hall, usual day. RC.

A.M., care, ate well, ambulated to bathroom, out in the hall, a usual day. Mrs. Spears, three to eleven, up in chair, appears very restless, confused, diet taken well. This notation was signed by Ruby Moran, LPN.

The eleven to seven shift, slept well. This was signed by Ann Curtail, LPN." Then, there was this quotation:

"Seven to three on 11/14 slipped from chair onto the floor. Dr. Gupton called. Came by and stated he thinks she has a fractured hip. Sent to St. Thomas Emergency Room for x-rays. Incident Report filled out and in office, Woodard, LPN. At 2:45, discharged to St. Thomas Hospital, R. Morgan, LPN."

The witness testified that she had had no difficulty whatsoever with Mrs. Brown in regard to sitting in the chair or trying to get out of it. She further testified that all of the elderly patients who were able to get out of bed used this same kind of chair.

Mrs. Ellen Woodard, a licensed practical nurse with prior training at Park View Hospital, testified that Mrs. Brown, on one or more occasions during the day, "usually a couple of times a day", would sit in the chair in question and have her meals and that they had never had any difficulty with Mrs. Brown trying to get out of the chair. Mrs. Woodard had just gone down to another part of the Nursing Home when she was called over the intercom to come back upstairs and, when she arrived there, she found, as she stated: "Mrs. Brown was kind of in a sitting-lying position, kind of against the chair." She stated that a Mrs. Lawrence was also there but that Mrs. Lawrence, at the time of the trial, was on vacation. She testified that she called Dr. Gupton soon after the accident and he came over to examine Mrs. Brown and diagnosed her trouble as a fractured hip. It was further testified that Dr. Gupton had ordered that the patient be moved about and encouraged to ambulate.

The foregoing is the sum and substance of the evidence offered in this case as to the accident and how it happened.

## ASSIGNMENTS OF ERROR

There are six assignments designated as "Specifications of Error" which we will discuss in the order in which they are presented.

Assignment No. 1 is:

"The learned Trial Court erred in overruling the plaintiffs' motion to declare the witness, Charlotte Barber, a hostile witness and in sustaining defense objections to allegedly leading questions."

■ Miss Barber, an employed Administrator of the defendant Nursing Home, but not an officer or member of the Board of the corporation, was called as plaintiffs' witness. Her testimony on direct and redirect examination covers thirty-five pages of the record and we agree with counsel for the defendant that a review of her

complete testimony reveals no legally sufficient ground for declaring her a hostile witness. Counsel for plaintiffs contends that this witness was evasive and that her testimony at the trial was in conflict with answers given on her discovery deposition, particularly, on the issue of the patient's need for restraint.

Our examination of her testimony does not lead us to conclude that she was evasive in her answers or that she was hostile in her attitude. Such discrepancies as there were in her testimony at the trial, as opposed to her testimony given in her discovery deposition, were very well explored by counsel for plaintiffs in his direct and re-direct examination.

Attention is called to the statement of the Supreme Court of Tennessee in Wilson v. Tranbarger, 218 Tenn. 208, 402 S.W.2d 449, 456 where it was said that, as a general rule in criminal as well as civil cases a party cannot impeach his own witness, subject to the exception that where a party is compelled to call an indispensable witness or a witness that is hostile *taking the party by surprise,* and one cannot be impeached where he or she is merely reluctant to give testimony or unless the testimony is actually prejudicial. Citing cases.

In the Tranbarger case, supra, it was pointed out that the witness in question was not an indispensable one since there were other eye-witnesses to the accident.

In the case at bar, Miss Barber was not an eye-witness and there were several other witnesses who were present immediately after the accident and who were better able to describe the facts and circumstances than was Miss Barber.

■ In addition to what has been said above, it is to be remembered that the matter of deciding whether a witness is hostile and in permitting counsel to cross-examine his own witness, the Trial Judge is vested with wide discretion. Whaley v. State, 187 Tenn. 507, 216 S.W.2d 17; Phipps v. State, Tenn., 474 S.W.2d 154, and other cases.

■ And, finally, Rule 12(5) of this Court and our decisions require an appellant to limit the errors complained of to those set out in his motion for a new trial in the Court below. O'Keefe v. Walker, 49 Tenn.App. 51, 350 S.W.2d 295, and other cases. Plaintiffs did not include this specification of error in the motion for a new trial.

It results that Assignment No. 1 is overruled.

Assignment No. 2 raises the question, did the Trial Court commit reversible error in ruling that the duty owed by the defendant to Mr. and Mrs. Brown under the law of contract was the same duty owed to them under the law of negligence.

It is argued in support of this assignment that the duty undertaken by the contract between the parties was not the mere duty of exercising ordinary care but was the duty to "furnish nursing care and such personal services as may be required for the health, safety and well-being of the patient", and that this calls for a higher degree of care than that required by the law of negligence.

In arguing this matter before the Trial Judge counsel for plaintiff was asked whether or not it was his insistence that the language of the contract made the Nursing Home an insurer of the safety of the plaintiff, and Mr. Moody, counsel for plaintiffs, answered as follows:

"You used the word 'insurer' which is a guarantee or indemnity agreement. I think, yes, that it does."

■ We are in agreement with counsel for the defendant that the Trial Judge correctly held under applicable Tennessee law that the contract was not an insurance or indemnity agreement but provided that the defendant would furnish such services as were reasonably necessary for the safety and well-being of Mrs. Brown.

In Rural Education Association v. Anderson, 37 Tenn.App. 209, 261 S.W.2d 151, it was said:

"A private hospital owes a duty to give its patients such reasonable care and attention for his safety as his physical and mental condition may require; and it must use reasonable care to safeguard him against any known or reasonably apprehended danger to himself due to his mental derangement."

We think the duty imposed on the defendant Nursing Home is the same as the duty undertaken by the contract, Plaintiffs' Exhibit 1, and that the measure of this duty is that degree of care, skill and diligence which is used by Nursing Homes generally in this community. Thompson v. Methodist Hospital, 211 Tenn. 650, 367 S. W.2d 134; Perkins v. Park View Hospital, Tenn.App., 456 S.W.2d 276.

Assignment No. 2 is overruled.

The third assignment quotes at length from the charge to the jury and counsel for plaintiffs interprets the language of the charge as an instruction to the jury that the right of Mr. Brown to recover was dependent upon the right of Mrs. Brown to recover and that Mr. Brown's suit is a derivative one.

In view of our action in regard to Assignment No. 2, it would seem to logically follow that the duty of the defendant with regard to the safety of Mrs. Brown under the contract was the same as that owed to Mrs. Brown under the general law of negligence as applied to hospitals and nursing homes, and, since the alleged breach of this duty was to be tested by the jury on a single set of facts, it seems to follow that Mr. Brown would not be entitled to recover if the jury found that Mrs. Brown was not entitled to recover. It results that Assignment No. 3 is overruled.

Assignment No. 4 raises the question, did the Trial Court commit reversible error in ruling that the doctrine of res ipsa loquitur was not applicable to the facts of the present case.

The Trial Judge charged the jury: "I charge you, ladies and gentlemen of the jury, that the plaintiffs have the burden of proof of all of the acts of negligence charged and of the injury and damages or losses sued for." He then charged the jury as to circumstantial evidence in which we find no error.

It is further asserted by counsel for the plaintiffs that the Judge's charge was in error because he failed to advise the jury of the applicability of the doctrine of res ipsa loquitur.

In view of the fact that the doctrine has no application unless the accident in question is one of a kind which ordinarily does not occur in the absence of negligence, Walls v. Lueking, 46 Tenn.App. 636, 332 S.W.2d 692, and since the Court judicially knows that the fall of an elderly person does not necessarily result alone from the negligence of another but may occur under circumstances when there is a complete absence of negligence on the part of any third party, or even of the injured party, we think the Court correctly held that the doctrine of res ipsa loquitur does not apply in the case at bar.

It should be further observed that the doctrine does not generally apply where specific acts of negligence are alleged and where evidence in support of such allegations is presented. In this case, plaintiffs specifically alleged that the chair and bib, or tray, were inadequate or defective, or that it had been inadequately or improperly secured, and evidence was presented in regard to these allegations. Kee v. Hill, 51 Tenn.App. 228, 366 S.W.2d 520; Ross v. Griggs, 41 Tenn.App. 491, 296 S.W.2d 641.

Assignment No. 4 is overruled.

Assignment No. 5 is as follows:

"The learned Trial Court erred in charging the jury as follows:

'Where a witness is equally available to both parties to a lawsuit and both

**510**

are manifestly interested in such witness' testimony to support their conflicting theories of the case, no inference for or against either party can be drawn from the failure to call such a witness.' "

In order to pass upon this assignment it is necessary to read the complete charge of the Court as to the question raised and, especially, the paragraph of the charge immediately preceding that quoted in the assignment.

In addition to the fact that the complete charge when read indicates that there was no error therein, it is to be further noted that counsel for plaintiffs offered no special request to correct the alleged error and, furthermore, did not refer to or include this specification of error in the motion for a new trial. It results that this assignment is overruled.

Assignment No. 6 is as follows:

"The learned Trial Court erred in overruling the plaintiffs' motion for a new trial."

Under our rules, this assignment is inadequate; however, since counsel follows said assignment with certain references to the record and certain specifications, we will consider it.

When the argument in support of the assignment is read, it appears that counsel's chief complaint is that the Trial Judge should have re-opened the trial or should have set aside the verdict and judgment and should have granted a new trial because of newly discovered evidence which consisted of proposed testimony of Miss Bonnie Ann Sanford and Mrs. Mary Lawrence, employees of the defendant Nursing Home, who, by affidavit, asserted certain facts with respect to the chair in which the plaintiff, Mrs. Brown, was seated and from which she is alleged to have fallen. Their affidavits particularly had to do with the question whether the chair was one that was equipped with a bib, or tray, or was merely an ordinary straight chair.

The Trial Judge, in considering the matter of granting a new trial on the ground of newly discovered evidence, is vested with a discretion which is very broad. Zirke v. Stegall, 163 Tenn. 323, 328–329, 43 S.W.2d 192; Smith v. Steele, 44 Tenn.App. 238, 313 S.W.2d 495. And it should be further noted that the granting of a new trial for newly discovered evidence is not favored by the Courts but is looked on with suspicion. Southwestern Transport Co. v. Waters, 168 Tenn. 596, 79 S.W.2d 1028, and other cases.

It is apparent from the record that these two witnesses and their employment by the defendant and their probable presence and knowledge were known to counsel for both sides prior to the trial. Certainly, it must be said that, upon any reasonable investigation of the matter in the exercise of reasonable diligence, their presence and their knowledge of the accident could have been readily discovered.

Furthermore, from the fact that Miss Sanford admitted that she had not told counsel for the defendant the truth when she was interviewed by him, and that Mrs. Lawrence admitted that, upon being interviewed by Mrs. Woods on two separate occasions, she had told him that she did not remember what type of chair Mrs. Brown fell from or any other facts or circumstances of the accident, it can be readily seen that the Trial Judge did not abuse his discretion in refusing to set the judgment aside and grant a new trial on the affidavits of these two witnesses.

This is more especially true in view of the fact that it can hardly be said that the question whether the chair was an ordinary straight chair or one with a bib or tray on it would be determinative in this case since the alleged negligence of the defendant goes largely to the question of whether defendant was under the duty of furnishing constant and continuous supervision of the patient by the presence of a nurse or attendant at all times, or was un-

der the duty of restraining the patient in bed or while sitting up.

We feel that this assignment must be overruled.

In the final analysis, it seems to us that the questions of care or lack of care, of negligence or lack of negligence on the part of defendant, were properly submitted to the jury that found in favor of the defendant, and that this verdict and judgment should be affirmed. It results that all of the assignments are overruled and the judgment of the Trial Court is affirmed.

Affirmed.

PURYEAR and TODD, JJ., concur.