IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 8, 2002 Session

## JANIS LOUISE OLIVER-GILL v. JERRY T. KROHN, ET AL.

**Appeal from the Chancery Court for Williamson County**
**No. I-26029     Robert E. Lee Davies, Chancellor**

_____

**No. M2001-02327-COA-R3-CV - Filed March 4, 2003**

_____

This appeal involves a suit brought by the buyer of certain real property against the builder and seller of that home seeking damages for, *inter alia*, negligent construction. From a jury verdict rendered in favor of the defendant, the plaintiff appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and TOM E. GRAY, SP. J., joined.

Thomas F. Bloom, Nashville, Tennessee, for the appellant, Janis Louise Oliver-Gill.

Richard M. Smith and H. Brent Patrick, Nashville, Tennessee, for the appellees, Jerry T. Krohn and wife, Linda L. Krohn, d/b/a Krohn Homes, LLC.

**OPINION**

Jerry T. Krohn and his wife, Linda L. Krohn, d/b/a Krohn Homes, LLC, constructed a house on a lot in the city of Brentwood, located on a hill in excess of twenty percent grade. When construction was commenced on or about August 26, 1995, consistent with the city requirements concerning lots of this type grade, the Krohns hired Ronald Jones and GEC, Inc., for the purposes of rendering a geotechnical survey and providing geotechnical supervision over the construction of this $699,000 home. This survey and report recommended that construction of the home be supervised by a geotechnical engineer, that compacted fill be used in preparing the site for construction, and that the builder should not place any structure on a slope steeper than thirty-three percent in grade. After completion of construction, but prior to Ms. Gill's purchase of the property, Mr. Jones was called back out to the property in June of 1997 to evaluate some extensive cracking and settlement occurring in the driveway turnaround of the home. In his investigation of this problem with the turnaround, Mr. Jones discovered that the rear section of the drive turnaround was constructed on six to eight feet of soil fill that was not adequately compacted. Dr. Jones recommended two options for the remedy of this problem. The Krohns chose the first option, i.e.,

to remove the drive turnaround, excavate the loose fill material, and replace that fill with shot rock, a mixture of heavy gravel and soil. Pursuant to this plan Krohn Homes' agent, Lewis Morris, excavated what he thought was the entirety of the uncompacted fill. Ms. Gill, through her agent Patricia Carter, with Shirley Zietlin & Company, began investigating this lot and house for the purpose of purchase in July of 1997. Consistent with this investigation, an inspection of the property was obtained. That inspection report showed that the driveway portion of the lot was incomplete at the time of inspection. The appellant, Janis Louise Oliver-Gill, purchased the house and lot now known as 6354 Shadow Ridge Road on or about July 27, 1997. Prior to that purchase, during the execution of the land sale contract, and for an eighteen-month period after purchase, this house and lot experienced repeated cracking and settling of the driveway and garage slab particularly. From July to December of 1997, the driveway turnaround, as well as the attached garage slab, continued to experience cracking and settling. In addition, during this time, Krohn homes, with the guidance of Ronald Jones, made several attempts to remedy the cracking and settling problem, the loose fill under the driveway, and the continued landsliding on the property. These efforts included the aforementioned excavation and replacement of uncompacted fill and the use of "V-trenches" and shot-rock buttresses to remedy the continued land movement. After eighteen months of attempts to remedy this situation, the parties discovered through pit excavation by Jones, and core drilling by geotechnical engineer John Goff, that the suspected loose fill had extended far below the six to eight feet of fill that had been removed and that, in fact, loose fill and decaying organic material existed up to twenty feet below the surface of the ground upon which the driveway was constructed.

After this discovery, Ms. Gill filed suit against Krohn Homes, Shirley Zietlin & Company, Ronald Jones and Patty Carter, individually, for violation of the Consumer Protection Act, fraud, negligent misrepresentation, intentional misrepresentation, and negligent construction. After responsive pleadings were filed and jury demanded, a jury trial was held in Williamson County Chancery Court. From a jury verdict in favor of the defendants Krohn Homes, et al., Ms. Gill brings this appeal, raising the following issues:

I.       Whether the trial court erred in failing to direct a verdict in Ms. Gill's favor against Krohn Homes on the issue of negligent construction;

II.      Whether the trial court erred in failing to instruct the jury as to the Doctrine of Res Ipsa Loquitur;

III.     Whether the trial court erred in instructing the jury that Krohn could not be found liable if he was "ready, willing and able" to cure the defects in the property.

## I.     DIRECTED VERDICT

It is well settled that this Court will not disturb a jury verdict if there is any material evidence to support it. Tenn. R. App. P. 13(d). When as here the case is submitted to the jury over a motion for directed verdict, the burden upon the appellate court receives a finer point.

A directed verdict is appropriate only when the evidence is susceptible to but one conclusion. *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994); *Long v. Mattingly*, 797 S.W.2d 889, 892 (Tenn. Ct. App. 1990). We must "take the strongest legitimate view of the evidence favoring the opponent of the motion when called upon to determine whether a trial court should have granted a directed verdict." *Id.* In addition, all reasonable inferences in favor of the opponent of the motion must be allowed and all evidence contrary to the opponent's position must be disregarded. *Eaton*, 891 S.W.2d at 590; *Long*, 797 S.W.2d at 892.

*Alexander v. Armentrout*, 24 S.W.3d 267, 271 (Tenn. 2000).

With the relative standards thus defined, this Court, on its review, must look at the jury's verdict and then decide if there is any material evidence to support that verdict. This Court is not permitted to re-weigh the evidence; the only question to be answered is whether a genuine material issue of fact exists with regard to the claim. If an issue exists, then submission to the jury was appropriate. The jury in this case was provided a verdict form. In that form regarding negligent construction, the question was posed to the jury: "Are the defendants at fault of the negligence with regard to the soil's suitability and the driveway problems?" To this question the jury responded in the negative.

To prevail on any claim of negligence, a plaintiff must establish a breach of the applicable standard of care owed by the defendant to the plaintiff proximately causing an injury or loss. *Lindsay v. Miami Dev. Corp.*, 689 S.W.2d 856 at 858 (Tenn. 1985); *see also McClenahan v. Cooley*, 806 S.W.2d 767, 774 (Tenn. 1991). The "ultimate issue" in negligence cases is the question of proximate causation. *McClenahan*, 806 S.W.2d at 774. The supreme court has held that this issue is a jury question "unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome." *See McClenahan*, 806 S.W.2d at 775.

Ms. Gill presented in her case in chief the testimony of two geotechnical engineers. Ronald Jones was the engineer who consulted with Krohn Homes during the construction of 6354 Shadow Ridge. John Goff was retained by the plaintiff primarily for the purpose of showing what measures would be required to remedy the settling problems with the house and the turnaround. As the appellant points out, Mr. Jones did testify that the three recommendations made in the initial report were, in his opinion, "good construction practice." When asked whether Krohn Homes' failure to follow his recommendations caused the soil problems in the driveway settling, Mr. Jones answered in the affirmative. In that same examination, however, Mr. Jones testified that his opinion was in hindsight.

The evidence is clear that the six feet or so of loose fill beneath the driveway was placed there by Krohn Homes. This is the same fill dirt that was removed by Krohn Homes and replaced with shot rock in the efforts to resolve the lack of compaction problem that was contributing to the continued settlement of the driveway. There is no evidence that Krohn Homes was aware of the

subsurface conditions existing underneath the shot rock fill. This was not known until October of 1998 when Mr. Jones dug the test pit. He testified:

> Q. In October of 1998 you dug a test pit, is that correct?
> A. Yes, sir.
> Q. And in October of 1998 that is the first time you really realized the severity of the problem; is that true?
> A. Yes, sir.
> Q. And the cause of the defective driveway and the faulty yard is a ravine that was underneath the driveway; is that accurate?
> A. That was our speculation that that would be the explanation for why there was such a deep fill in that one location whereas the house we knew was on much more shallow ground.

The controlling question then is not what Krohn Homes knew at the time of the construction but what in the exercise of reasonable diligence, Krohn Homes should have known relating to the subsurface conditions. As to this controlling issue, Mr. Jones testified:

> Q. Mr. Jones, is it a standard practice in the residential construction community to test the compaction of fill under a driveway before the driveway is poured?
> A. Are you talking about a fill that is already there or a fill that you are placing?
> Q. A fill that is already there?
> A. Probably not for residential construction.

So a jury question is made and the trial court correctly overruled the plaintiff's motion for a directed verdict.

## II.    JURY INSTRUCTIONS

The next two issues raised on appeal concern the court's jury instructions. Specifically, the appellant complains of the trial court's refusal to instruct the jury regarding the doctrine of *res ipsa loquitur*. In addition, the appellant challenges the following instruction as erroneous:

> The defendants have the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues: 1. That the plaintiff should have mitigated her damages. 2. That defendants were ready, willing, and able to cure any defects in their work.

The trial court's duty in instructing a jury is a well settled proposition. "Trial courts have a duty to give substantially accurate instructions with regard to every fact and theory raised by the pleadings and supported by the proof. *See, e.g., Street v. Calvert*, 541 S.W.2d 576, 584 (Tenn.

1976). However instructions are not expected to be perfect. *In re: Estate of Elam*, 738 S.W.2d 169, 174 (Tenn. 1987). The task of the appellate court is equally well settled: To review the instructions in their entirety and in context to determine whether the instructions as a whole fairly and accurately embody the parties' theories. *See Ingram v. Earthman*, 993 S.W.2d 611, 626 (Tenn. Ct. App. 1998)."

Regarding the court's "ready, willing and able" instruction, the appellant urges that this introductory summary of the relative burden of the parties prevents the jury from finding Krohn Homes liable for negligence if they were ready, willing and able to cure any defects in their work. Although the trial court lists no authority or factual basis for this introduction, when viewed in the context of the whole jury instruction, this Court does not find the introduction misleading. The requirements for proving a *prima facie* case of negligence in construction is provided elsewhere in the charge. In addition, the jury verdict form indicates that the jury found, not that the defendant met its "burden" as described, but rather that the plaintiff did not meet her burden.

The doctrine of *res ipsa loquitur* revolves around the rebuttable presumption of a breach of duty of care when a plaintiff shows that an instrumentality proximately causing injury is within the exclusive control of the defendant, and the injury is of such a type that normally would not occur but for negligence. *See Susman v. Mid-South Fair*, 180 Tenn. 471, 474, 176 S.W.2d, 804 (1944). The facts as presented to the jury do not of themselves support the presumption. Ronald Jones testified that there was no way to tell the origin of the subsiding fill on 6354 Shadow Ridge Property. With regard to the uncompacted fill and attempts to remedy the settling Mr. Jones testified:

A. We found about 20 feet of unsuitable material. Now the lower three or four feet of that was wet clay that could be washing material into an old ravine. Above that was about three or four feet of topsoil which could have been a wash in. And then the ten feet above that was uncompacted fill.
Q. And you didn't realize that ravine was there until October of 1998 or May of 1998; is that right?
A. That's correct.
Q. You don't know who put that unsuitable material in that old ravine; do you?
A. No, sir.
Q. You don't know if it was the developer, whether it was someone else or whether it was Mr. Krohn?
A. Well, from what I recall about the grading of the site at the time that the house was built, it is certainly possible some of that fill was already in there. But there was definitely fill added by the builder after the house was finished.
Q. That was that six to eight foot of fill that Mr. Krohn and Mr. Morris told you about; is that correct?
A. Yes.
Q. That was pulled out right - -
A. Yes.

Q. In June, after your June 9th letter, is that correct?

A. Yes, it was.

Q. I want to look at your June letter real quick, and I don't need any help from anybody. The way I read this letter, Mr. Jones, is to build a retaining wall at the base of the slope would control the sliding but would not control the consolidation settlement; isn't that right?

A. That's correct.

Q. So if Lewis Morris exercised option one, it would look like to me option one would take care of both problems?

A. It would have if it had been done deep enough.

Q. That is right if the fill was only six to eight feet like Lewis Morris told you, this would have worked; right.

A. Most likely, if that had been the only unsuitable material.

Q. Okay. But as we know there was another 15 foot of bad unsuitable material underneath that; right?

A. Ten to twelve feet and more.

Q. It is completely reasonable for Mr. Morris to exercise option one in light of the circumstances that he understood at the time?

A. It would have been provided as I said that he got down to the firm bearing.

Upon re-direct by the plaintiff, Mr. Jones added the following:

BY MR. CHEATHAM:

Q. I would like to - - you have a copy of your deposition in this case; don't you?

A. Yes, sir.

Q. At page 32 I believe did you not testify that there was - - that you thought that there was - - they pushed material out toward the driveway area when they cut the house out?

A. We mentioned that as one of the possibilities that the source of the material that was filling in the old ravine was possibly from more than one source. One logical explanation would be as they cut the house out, they would have pushed the material out. And some of it would have gone in the ravine.

And I also I think I indicated that for all we know when they built the road they could have pushed some of the material in at that time too.

Throughout the subsidence no one was aware of the extent of the loose, uncompacted fill. Mr. Krohn testified as follows:

Q. Well, let's get back to the driveway. Tell the jury what happened in September of 1998 after these last repair efforts eight months ago.

A. Ron Jones came back out again, inspected the driveway and he said, okay, this time we need another one of these V trench buttresses but we need it right below the end of the driveway, about 10 feet off the end of the driveway.

All this time it was obvious that he didn't know exactly what the problem was because everything he was trying wasn't working. And I'm not an engineer. I don't know how to do it myself, so I have to follow the engineer's advice.

So we came back right at the end of the driveway and dug another V trench down 15, 18 feet; filled it full of shot rock hoping that would hold whatever was causing the slide under that back portion of that driveway up. So we dug the trench. He came and out and inspected our work at that time on-site while it was open and approved it and we refilled the trench.

Q. Okay. Now at this particular time was the ravine discovered?

A. It was a little after this in September of '98 towards – a little closer towards the end of the year that he finally came up with – surmised that, you know, we've got a problem here that's much deeper. And what – do you want me to expound on it?

Q. Yeah, go ahead.

A. And what really solidifies that is when this Mr. Goff testified the other day that he did these core drillings and he went down 23 feet or something like that and he came up. And, remember, he said the first six feet was fill, which we did. Then there was another portion of dirt. Then you got into another so many feet of fill and then you got down to something that smelled like sewage.

Well, what happened is when the developer was building the roads in there and he's cutting that cul-de-sac up there, he's cutting down trees and digging up stumps and all this stuff. Well, he's got to do something with them. There obviously was a ravine on the right side of that lot.

Q. I want you to show the jury.

A. In this area right here (indicating) when they dug these streets out there was gully or a ravine going down this way. And what they did is they took debris and stuff out of this road, trees and stumps and stuff, and filled that ravine. Then they came back and put their own fill on top of that. Then they came back and put dirt on top of it.

If you remember, when he was going down his specimen he said I've got eight feet of fill. I've got two feet of top soil. Then I've got another six feet of fill or so and then I run into this stuff that smells like sewer. Well, that's rotting and decaying tree stumps and stuff.

So our problem, which we thought was our fill or whatever, was not – that wasn't our problem at all. And we've been treating a guy with dandruff with foot medicine or something. We weren't even attempting – in fact, everything we were doing was helping to cause more problems because as we were putting all this weight up on the hill and the shot rock and this stuff is decaying and moving and

-7-

water going through the stuff underneath, it's pushing down and causing the hill to push out.

So I've spent upwards of $50,000 at least working on this thing and it hadn't worked. But we never once stopped trying to fix it. By the time we can surmise what's going on – do you want me to carry on?

Q.     Yes, sir, go ahead.

A.     It's the latter part of December. Well, in January I get a letter from Mr. Cheatham and he's threatening me with a lawsuit if I don't buy the house back and pay them a substantial amount of money. Well, I told them I wasn't prepared to do that.

So he filed suit and Mr. Cheatham told me to get off the property. I couldn't do anymore work, anything else to it. So to this day I don't know if the work that we did in December – October and December of '98 actually worked or not. It was left open.

Now, folks, you can't leave open ground unattended. You all saw the pictures on the television of all that water running off the back of that driveway. That's been going on for three years. That's going to erode things. It's going to wash out things and it's going to make it look just as bad as that looks. But the problem is we were never allowed to finish it.

Mr. Krohn and Mr. Jones testified that the fill which led to the settling and cracking could have come from the original developer of the subdivision or road construction prior to Krohn Homes' ever purchasing the projects.

The unknown subsurface conditions did not constitute an instrumentality under the exclusive control of the defendant. It was not error for the trial court to decline to charge *res ipsa loquitur*.

> The *res ipsa loquitur doctrine* does not apply in cases where reasonable persons could not conclude that the defendant's negligence, more probably than not, caused the plaintiff's injury. *W. Page Keeton, et al., Prosser & Keaton on the Law of Torts* § 39, at 248 (5th ed. 1984). Accordingly, the *res ipsa loquitur doctrine* does not apply in cases where the plaintiff's injury could reasonably have occurred even without the defendant's negligence. *Cockrum v. State*, 843 S.W.2d 433, 438 (Tenn. Ct. App. 1992); *Brown v. University Nursing Home, Inc.*, 496 S.W.2d 503, 509 (Tenn. Ct. App. 1992); *Walls v. Lueking*, 46 Tenn. App. 636, 643, 332 S.W.2d 692, 695 (1959).

*Underwood v. HCA Health Services of Tennessee, Inc.*, 892 S.W.2d 423, 427 (Tenn. Ct. App. 1994).

There is something disquieting about paying $699,000.00 for a new home and then being beset by problems that seem to defy remedy. To have a driveway settling in the manner depicted by photographs in this case, rendering the garage all but useless for its intended purposes and making for an unsightly condition is certainly not what Appellant bargained for or envisioned. This is,

however, a negligence case in which the burden of proof rested upon the plaintiff to prove that the builder was at fault.  We have a jury verdict on a question of fact.  There is material evidence in the record to support the verdict of the jury and at this point the appellate inquiry comes to an end.

The judgment of the trial court is in all respects affirmed with costs assessed to the appellant. Costs are assessed to Appellant.

_____
WILLIAM B. CAIN, JUDGE