IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 4, 2005 Session

## LEE PITTMAN v. WILLIAMSON COUNTY

**Appeal from the Circuit Court for Williamson County**
**No. 01631      R. E. Lee Davies, Judge**

---

**No. M2003-02860-COA-R3-CV- Filed August 9, 2005**

---

This appeal comes from the trial court's dismissal of the plaintiff's governmental tort liability claim and its denial of the plaintiff's Motion to Alter or Amend based on newly discovered evidence. We affirm the trial court in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and PATRICIA J. COTTRELL, J., joined.

Phillip Leon Davidson, Nashville, Tennessee, for the appellant, Lee Pittman.

Lisa Carson and Melanie Dillender, Franklin, Tennessee, for the appellee, Williamson County.

### OPINION

This appeal results from the trial court's dismissal after trial on the merits of Mr. Pittman's governmental tort liability claim against Williamson County, Tennessee. Mr. Pittman was serving a misdemeanor  sentence in the Williamson County jail when he was involved in two fights with other inmates. After the second altercation with fellow inmates, Mr. Pittman filed his Complaint in Williamson County Chancery Court seeking relief under Tennessee's Governmental Tort Liability Act. *See* Tenn.Code Ann. §§ 29-20-101 et seq. Mr. Pittman alleged that Williamson County, having received knowledge of an assault against him on June 1, 2001, failed to segregate Mr. Pittman from the general population of the jail, and that this failure in light of a foreseeable danger to Mr. Pittman proximately caused his injuries suffered at the hands of fellow inmates. Williamson County denied liability, asserting that Mr. Pittman was responsible for his own injuries in that he failed to follow deputies' instructions and instigated the second brawl involving the other inmates.

The record reveals that on June 1, 2001, Mr. Pittman was attacked in his cell by several Williamson County inmates. Inmate Jacquese Quita Oglesby was allegedly one of these individuals. After initially refusing to cooperate with jail personnel investigating the incident, Mr. Pittman

through counsel requested to be segregated from the general population and placed into protective custody. The record reveals that, though the request was made prior to a shift change, the jail's second shift staff was not informed of the protective custody request.

On June 3, 2001, Mr. Pittman was under the direct supervision of Deputy Allen Floyd. Deputy Floyd had collected him from Pod 101 of the jail complex in the course of the deputy's duties supervising the visitation for that day. The deputy testified at trial that he instructed Mr. Pittman to remain seated on a bench outside the visitation room while Floyd cleared out inmates whose visitation had ended. The parties dispute how the ensuing fight began, but it ended with Mr. Pittman suffering injuries to his head and face. After a full hearing during which the trial court heard from several witnesses including the plaintiff, sheriff's department personnel, expert testimony by deposition, and inmates Oglesby and Rucker, the trial court dismissed Mr. Pittman's Complaint. The trial court found Pittman at least 50% at fault for his own injuries. The trial court specifically found that Mr. Pittman was the author of his own injuries by disobeying sheriff's department personnel's orders which were issued for his protection, and in instigating the brawl among the inmates. The following portion of the court's order deals with the defendant's duty.

> The Court finds that Williamson County had a duty to exercise reasonable care for the protection of Plaintiff Lee Pittman, an inmate in the Williamson County Criminal Justice Center, and that it breached that duty on June 3, 2001, when a corrections officer failed to promptly pass on to proper jail personnel the identity of another inmate who may have assaulted Pittman on June 1, 2001, as more fully described in the transcript of the Court's findings attached hereto and incorporated herein. As a result, Pittman was taken to visitation with the general population and became involved in a second fight on June 3, 2001.

After the trial court rendered its Judgment, Mr. Pittman's counsel filed a motion pursuant to Tennessee Rule of Civil Procedure 59.04 arguing that newly discovered evidence tended to show that his client was not the first aggressor in the second brawl. The trial court considered the motion and denied it. Mr. Pittman challenges both actions of the trial court on appeal.

## I. THE TRIAL COURT'S DISMISSAL

The Chancery Court order on Mr. Pittman's complaint came after a full hearing and contained specific findings of fact. Our review of these findings is governed by Tennessee Rule of Appellate Procedure 13(d). We presume that factual findings are correct absent a preponderance of the evidence to the contrary. *See Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425 (Tenn.1989). When the issue raised on appeal is one purely of law, our review of the trial court's decision is *de novo* with no presumption of correctness on appeal. *See Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn.1995). We defer to the trial court on issues involving the credibility of witnesses and the weight afforded to such testimony. *See Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn.Ct.App.1997). The reason for this deference is well grounded in our common law. The trial court is in the best position to view the demeanor of the witness and to make such credibility

determinations. *See Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn.Ct.App.1998). Our review of the record reveals that Mr. Pittman was serving his misdemeanor assault charge after being involved in yet another altercation with an Alcohol, Tobacco and Firearms ("ATF") agent, who happened to be the estranged boyfriend of Mr. Pittman's daughter. Mr. Pittman testified in his case in chief that after he was arrested for assaulting the ATF agent, he fled the jurisdiction only to return and plead guilty to a reduced charge of assault and failure to appear. During his service of these two sentences, Mr. Pittman was assaulted in his cell by Mr. Jacquese ("Quita") Oglesby. Mr. Pittman provided the following testimony regarding the events leading up to and including the first assault:

> Q.    Now, tell us how you came to – – how you and Mr. Oglesby – – how you first met him; what happened; what led to that assault.
>
> A.    Well, it's – – every meal that we went to the dining hall it seemed like he and two or three others, sometimes more, would wait until I got to the front of the chow line, and then they would come up and get in front of me. And the guard that was standing at the chow line, he wouldn't – – you know, he didn't enforce any rules; he just made me move over.
>
> So after 10 days or so of this, on the morning of June the first when they came to get in front of me, I refused to let them go. I said, "No; if you want to eat before me, get in line before me."
>
> And the corrections officer again made me move and let them go. And within 10 minutes after that when I got back to my cell, I go back to my cell and I see Oglesby coming into my cell and I see at least two, and maybe more, other guys standing at my door blocking off any view. And then I was attacked.

Mr. Pittman eventually identified Quita Oglesby, but he made no contemporaneous complaint of the assault to jail authorities.

> Q.    Now, after this assault, did you complain about this – – did you let anybody, your family, or anybody know about it?
>
> A.    I did call my daughter.
>
> Q.    Is that how your lawyer ended up being there the next night?
>
> A.    Yes. I called my daughter and I asked her if she might not want to come to visitation, because I didn't really look presentable. And I didn't want to upset her.
>
> Q.    Now, I want to go into did anyone – – you've heard Lieutenant – – or Mr. Barron's testimony in this case. Did anyone talk to you about this first assault? Did you have – – to your knowledge, do you remember anything about that?

A.   No one ever asked me anything about it.

Q.   And you remember being placed in protective custody though at some time?

A.   I do remember.

The transcript shows that Mr. Pittman has no independent recollection of the second assault.

Q.   Tell the – – what's the next – – tell the Judge the next thing you remember.

A.   I remember them telling me it was time for my visitation.  And I recall them unlocking the first door and us going through the first door, and locking that door back.  And then unlocking the second door, going through, locking that door back.  And I recall looking up the long hallway to the third door, but that's where my memory stops.

Q.   What's the next thing you remember?

A.   Waking up in the hospital chained to a bed.

Mr. Pittman produced only two other witnesses with direct knowledge of the incident of June 3 during his case in chief.  Deputy Allen Floyd testified that he was the visitation officer in charge of Mr. Pittman at the time of the fight.  Floyd also testified that he was unaware of any request for protective custody made on Pittman's behalf.  However, the deputy stated that he collected Mr. Pittman from Pod 101, where prisoners were kept who were segregated from general population.  Deputy Floyd stated that he had never been informed that Quita Oglesby had previously been in a fight with Pittman.  Over defense objection, Deputy Floyd testified that had he known Oglesby and Pittman were involved in the prior altercation, he would not have allowed the two inmates to "cross paths."  Although he could not testify as to how the fight began, Deputy Floyd stated that Pittman, in violation of instructions from Floyd, left a bench upon which he was seated and proceeded into the visitation room prior to it being "cleared" of other prisoners.  The testimonial record reveals that the confrontation between Pittman on one side and Joe "Rooster" Rucker and Jacquese "Quita" Oglesby on the other side took place in the doorway to the visitation room:

Q.   Now, when you brought Mr. Pittman out of 101, you brought him past this door, didn't you?

A.   Yes.

Q.   And right here is a bench, isn't it?

A.    Yes, Sir.

Q.    And you told him to sit on the bench?

A.    Yes.

. . .

Q.    This is the bench again where Mr. Pittman was told to sit down?

A.    Yes.

Q.    And at the time just prior to this incident happening, a gentleman named Jacquese Oglesby and a gentleman named Joe Rucker were other prisoners having visitation in the visitation cell; weren't they?

A.    Yes.

Q.    And they had already came (sic) out and passed you before Mr. Pittman passed you, didn't they?

A.    Yes.

Q.    And then Mr. Pittman got off the bench and walked past you, didn't he?

A.    Yes.

Q.    And at that time you saw – – you put in your statement – – the swinging; didn't you?

A.    I saw Jacquese – – I saw Jacquese Oglesby's arm extended out like this, (indicating).

Q.    Okay.  So at some point in time Mr. Pittman, Jacquese Oglesby and Mr. Rucker were going to path – – were going to cross paths, even if Mr. Pittman had been sitting on that bench, wouldn't they?

A.    Yes.

The only other testimony concerning this second altercation came byway of former inmate DePreko Bonds.  Although Bonds' testimony conflicted with his prior written statement, both versions of the events of June 3 were presented to the trial court.

Q. (Tenders document to witness.) First of all, do you recognize that document? Take your time to read it over.

A. (Witness complies.)

Q. Is that your signature – –

A. Yes, Sir.

Q. – – at the bottom?

And does that statement taken to you – – taken from you by Sheriff's Department personnel on the date indicated there? In other words, the people at the Sheriff's Department got you to make that statement; correct?

A. Yes, Sir.

Q. What date is that on there that you made that statement?

A. Six – – I guess it's 6/6/01.

Q. And was your memory at the time you gave that statement good; is that what you remember seeing?

A. Oh, yeah.

Q. Now, let me ask you this: Tell the Court what you saw – – how you saw this fight occur based upon your recollection of your memory there.

A. Well, one gentleman was coming – – was going into visitation with us and the – – another gentleman was coming out of visitation. And I guess they had had some confrontation, you know, back in the pods or what-not, and I know that the older white guy and the younger black guy got into a confrontation; they were hitting each other.
And this bigger guy, Rooster – – that's the name I remember him by – – he tried to break it up. He got hit. And when he got hit, he hit the older white guy. And when he hit the floor, one of the guards was hollering for help instead of breaking it up. He moved us out of the way. And they were just kicking him.

The prior statement as eventually read into the record provided:

Q. Mr. Oglesby [sic], I'm going to read this statement and ask you a question. "On 6/3/01 – – this is the statement – – Jacquese Oglesby was standing just

-6-

inside the door to visitation. I, DePreko Bonds, was standing facing through the door on the outside of the hallway. Lee Pittman started through the door going into the visitation room when Jacquese Oglesby hit Pittman. Pittman tried to fight back and then Joe Rucker (Rooster) then hit Pittman in the face and he went to the floor. Oglesby and Rucker started kicking him while he was on the floor. Floyd was yelling for help over the radio and the hitting didn't stop until the other officers got there to help Officer Floyd. Officer Stewart"– – it looks like – – "Mingle and Harris broke up the fight. They told us to leave and I did. Signed DePreko Bonds."

On cross examination, Bonds further testified:

BY MS. CARSON:

Q.    Mr. Bonds, you testified earlier that when you first saw the fight or what was going on, that the older white man and the younger black man were hitting each other; is that correct?

A.    Yes, Ma'am.

Q.    Do you know which one of those two individuals threw the first punch?

A.    Honestly, I want to say that the younger guy – – the younger black guy hit the older white guy first, I think.

As we was going in the door there was a couple of people there. That's how you go in – – you're supposed to wait till they come out, then you go in. But we went – – we just did it wrong; we went in instead of waiting.

And as we was going in, I was on this side of the door getting ready to go in the door, and the younger black guy – – there's a little walkway where the seats are – – he was coming this way, (indicating). And I remember him – – I don't know if the white guy hit him first or not, but I did see that black guy hit that white guy.

And after that I know the bigger guy, Rooster, he tried to break up the fight. And I don't know if it was accidental or not, but he got hit. And then when he hit the white guy, he went down. And that's as far as I know.

Q.    Do you recall a couple of weeks ago talking to Ms. Dillender out here in the parking lot the last time you came – –

A.    Yeah.

Q.    – – you were – – sitting – – this lady over here?

A.    Uh-huh.

Q.    Do you remember telling her about the older white guy kind of coming up out of nowhere – –

A.    Going into the visitation room, uh-huh.

Q.    And he kind of came up out of nowhere toward Mr. Oglesby, or the young black man; didn't he?

A.    Uh-huh.

Q.    And you're not sure whether he hit Mr. Oglesby or not?

A.    I'm not sure if he hit him or not.  But I know that other guy hit him.

MS.  CARSON: Okay.  Thank you.

As can be expected, Rucker's and Oglesby's versions of the altercation vary greatly from the version proffered by Mr. Pittman.  Oglesby testified that he was leaving the visitation room with other inmates including Rucker when Pittman threw a punch at Oglesby that landed on Rucker. Oglesby's version resonates in Rucker's direct tesimony:

Q.    Where was Mr. Pittman when you first saw him?

A.    When I first saw him he was sitting right there beside the nurses' station on a bench.

Q.    And when did you next have contact with Mr. Pittman after that?

A.    When I came out of visitation because I was talking to Officer Floyd. The next thing I know, I turned around, the man's running and swinging and he hit me in my jaw.  The next thing, I fell into the door and I got up and I said what the fuck did you hit me for?  He didn't say nothing, so I beat his ass.

In resolving the dispute among the varying versions of the second altercation, the trial court made the following determination:

The Court further finds that Pittman was ordered to sit on a bench down the hall from the visitation area until the area was cleared, but that Pittman disregarded those express instructions, got up from the bench and proceeded to the doorway where he initiated the fight with other inmates.  The Court finds that it was not reasonably foreseeable that Pittman, who was being held in protective custody due

-8-

to a prior assault, would attack another inmate, and therefore finds that it is appropriate to compare the fault of Pittman to that of Williamson County in this matter.

The Court further finds that Pittman was fifty (50%) percent or more at fault with regard to the injuries which he incurred, and therefore finds that his recovery is barred under principles of comparative fault, and his Complaint should be dismissed.

Reviewing the findings of the trial court pursuant to Tennessee Rule of Appellate Procedure 13(d), we find that the evidence does not preponderate against the trial court's finding that Pittman initiated the second fight. The trial court did find that the County had a duty to exercise reasonable care for Pittman's protection and could reasonably foresee the result of a lapse in that protection. Nonetheless, the County could not foresee that the very individual who sought its protection would step outside of the bounds of that protection and instigate the fight with Rucker and Oglesby. Since this case was tried on its merits without benefit of a jury, the question of foreseeability becomes in large part a question of fact concerning the effects of each party's conduct. *See Dobson v. State*, 23 S.W.3d 324 (Tenn.Ct.App.1999); *see also Easley v. Baker*, No. M2003-02752-COA-R3-CV, 2005 WL 697525, *6 (March 24, 2005). The trial court found that the plaintiff was 50% or more at fault, and this Court does not find a preponderance of the evidence to the contrary.

## II. MOTION TO ALTER OR AMEND

After entry of the Final Judgment of the trial court on October 27, 2003, Plaintiff on November 6, 2003, filed a Tennessee Rule of Civil Procedure 59.04 Motion to Alter or Amend the Judgment based on alleged newly discovered evidence.

The most thorough and comprehensive discussion concerning appellate review of the discretionary action of the trial court in either granting or denying a motion for a new trial on grounds of newly discovered evidence is set forth by this Court in *Seay v. City of Knoxville*, 654 S.W.2d 397 (Tenn.Ct.App.1983). In that case, the trial court had first entered judgment for the defendant who promptly filed a motion for a new trial based on newly discovered evidence. The trial court granted the motion, heard the new trial and, thereafter, gave judgment for the plaintiff in the amount of $17,500. Defendant appealed, arguing that the trial court had erred in granting a new trial based upon newly discovered evidence. A divided court of appeals reversed the trial court and re-instated judgment for the defendant. Said the Court:

Another principle of law that is deeply ingrained in the holdings of our courts and has been repeated in the majority of the some 65 cases where our courts have addressed this issue is that to justify a new trial for newly discovered evidence it must be shown that the new evidence was not known to the moving party prior to or during trial and that it could not have been known to him through exercise of reasonable diligence. *Chicago Guar. Fund Life Soc'y V. Ford*, 104 Tenn. 533, 58 S.W. 239 (1900), *Martin v. Nance*, 40 Tenn. 649 (1859); *Frazier v. McFerren*, 55 Tenn.App.

431, 402 S.W.2d 467 (1964); *Monday v. Millsaps*, 37 Tenn.App. 371, 264 S.W.2d 6 (1954); *Bean v. Commercial Securities Co.*, 25 Tenn.App. 254, 156 S.W.2d 338 (1941); *Blue Bird Coaches, Inc. v. McGregor*, 14 Tenn.App. 23 (1931); *Wilkerson v. Joyce-Watkins Co.*, 5 Tenn.App. 356 (1927); *Tennessee Eastern Elec. Co. v. Link*, 6 Tenn.App. 617 (1926). Thus, an attorney has a duty to investigate prior to trial, *Tipton v. Smith*, 593 S.W.2d 298 (Tenn.App.1979); *Brown v. University Nursing Home, Inc.*, 496 S.W.2d 503 (Tenn.App.1972); *City of Knoxville v. Ryan*, 13 Tenn.App. 186 (1929); *Demonbreun v. Walker*, 63 Tenn. 199 (1874); *Tabler v. Connor*, 60 Tenn. 195 (1873), to call appropriate witnesses at trial, *Zirkle v. Stegall*, 163 Tenn. 323, 43 S.W.2d 192 (1931); *Wilson v. Nashville, C. & St. L. Ry.*, 16 Tenn.App. 695, 65 S.W.2d 637 (1933); *Stafford v. Stafford*, 1 Tenn.App. 477 (1926); *Ware v. State*, 108 Tenn. 466, 67 S.W.853 (1902), to fully examine all witnesses, *Noel v. McCrory*, 47 Tenn. 623 (1868); *Luna v. Edmiston*, 37 Tenn. 159 (1857); *Darnell v. McNichols*, 22 Tenn.App. 287, 122 S.W.2d 808 (1938), and to secure evidence of which counsel becomes aware at trial. *Bradshaw v. Holt*, 200 Tenn. 249, 292 S.W.2d 30 (1956); *Southwestern Transp. Co. v. Waters*, 168 Tenn. 596, 79 S.W.2d 1028 (1935); *Whitfield v. Loveless*, 1 Tenn.App. 377 (1925). The client is also under a duty to act with due diligence in securing evidence for trial. *Hayes v. Cheatham*, 74 Tenn. 1 (1880); *Harbour v. Rayburn*, 15 Tenn. 432 (1835); *Puckett v. Laster*, 56 Tenn.App. 66, 405 S.W.2d 35 (1965); *Spence v. Carne*, 40 Tenn.App. 580, 292 S.W.2d 438 (1954).

. . .

The most oft-repeated principle governing motions for a new trial on the basis of newly discovered evidence is that the granting or denial of such a motion is within the discretion of the trial court. *See, e.g. Tipton v. Smith*, 593 S.W.2d 298 (Tenn.App.1979); *Diversified Equities, Inc. v. Warren*, 567 S.W.2d 171 (Tenn.App.1976); *Johnson v. Woman's Hospital*, 527 S.W.2d 133 (Tenn.App.1975); *Brown v. University Nursing Home, Inc.*, 496 S.W.2d 503 (Tenn.App.1972). In *Tabler v. Connor*, 60 Tenn. 195 (1873), the Tennessee Supreme Court placed the following limitation on that discretion:

> "There are well settled rules for granting of new trials, by which the present case must be governed. 1. If a party omits to procure evidence which with ordinary diligence he might have procured, in relation to those points, on the first trial, his motion for a new trial for the purpose of introducing such testimony shall be denied. 2. If the newly discovered evidence consists merely of additional facts and circumstances, going to establish the same points which were principally controverted before, or of additional witnesses to the same facts, such evidence is cumulative, and a new trial shall not be granted. In cases to which these principles clearly and unquestionably apply, the granting or refusal of a new trial is not a matter of

-10-

discretion. The parties have a legal right to a decision conformable to those principles. Where there is doubt upon the point of negligence, or as to the character of the evidence, or as to its materiality, it becomes a matter of discretion; and the Court will not — perhaps cannot — rightfully interfere." *Id.* at 197-98.

See also: *Illinois Cent. R.R. v. Exum*, 41 Tenn.App. 450, 296 S.W.2d 372 (1955). In addition, whether diligence is shown by a particular state of fact is, of course, a question of law. *Ross v. State, supra*. Given the law's traditional distrust of such motions, see *Ross v. State, supra*; *Moore v. State, supra*; *Brown v. University Nursing Home, Inc., supra*, it is not surprising that appellate courts are loath to interfere with the trial court's ruling. *See, e.g., Evans v. Evans*, 558 S.W.2d 851 (Tenn.App.1977); *Illinois Cent. R.R. v. Exum*, 41 Tenn.App.450, 296 S.W.2d 372 (1955). The appellate courts of this state have not hesitated, however, to reverse the trial court when its ruling was erroneous on the law or would result in injustice. *Memphis Street Ry. Co. v. Cooper*, 203 Tenn. 425, 313 S.W.2d 444 (1958); *Demonbreun v. Walker*, 63 Tenn. 199 (1874); *Dunivant v. Plew*, 15 Tenn.App. 60 (1932); *Tennessee R.R. Co. v. Kingsley*, 10 Tenn.App. 637 (1929).

*Seay*, 654 S.W.2d at 399-401.

Judge Herschel Franks asserted in his dissent that the trial court had not abused its discretion in granting the motion for a new trial:

A further requirement is that by exercise of "reasonable diligence" the evidence could not have been procured for the trial. I am not prepared to hold as a matter of law on this record that Plaintiff's attorney did not exercise reasonable diligence in preparing the case for trial. Before us, the burden is on the City of Knoxville to affirmatively show the Trial Judge abused his discretion in granting the new trial. See *Esstman v. Boyd*, 605 S.W.2d 237 (Tenn.App.1979). It is presumed the Trial Judge properly exercised his judicial discretion, and in the absence of showing that an injustice has been done appellate courts will not reverse. *Jones v. State*, 79 Tenn. 468 (1883).

*Seay*, 654 S.W.2d at 402.

A review of the evidence sought to be introduced indicates that it is relevant evidence which might well have been persuasive had it been presented at the trial. Two questions are determinative of the issue on appeal: (1) Does the record show " that the new evidence was not known to the moving party prior to or during the trial and that it could not have been known to him through exercise of reasonable diligence?" and (2) Did the trial court abuse its discretion in denying the Motion for a New Trial?

-11-

The newly discovered evidence sought to be introduced was the testimony of Jacquese Oglesby given on November 26, 2001, the deposition of Earl Claspell taken October 21, 2001, and Williamson County Circuit Criminal File No. I-801-259-A.

In his memorandum supporting his Motion for a New Trial, Plaintiff asserts:

## NEWLY DISCOVERED EVIDENCE

I.      In Court testimony of Jaquez Oglesby, November 26, 2001. Before the trial, the plaintiff informed the Court that the Clerk's office would not let him see Jaquez Oglesby's file. The Trial Court, after reviewing the file, turned it over to the plaintiff. After reviewing the file, the plaintiff found no evidence of any affirmative defenses. Oglesby was listed as a witness by the defendant on September 15, 2004, just nine days before trial. Oglesby testified at trial that Lee Pittman had hit Joe Rucker. The plaintiff has since requested and obtained the certified taped recording of Oglesby's plea agreement to assault and battery. At this hearing, the District Attorney General makes a statement that "Oglesby and Joe Rucker attacked Lee Pittman presumably after he made some remark towards them." Oglesby, who was represented by counsel, was asked if what the District Attorney said was in fact true. He replied, "Yes!" There was no statement or evidence of any first strike by Pittman.

2.      The deposition of Earl Claspell taken October 2001. Earl Claspell was a jailer during the June 3, 2001 indicent. A subpoena was hand carried to the Clerk's office on September 11, 2003. It was issued six days later on September 17, 2003. It was returned on September 25, 2003 as "unable to serve." Claspell, at the time of the "service attempt" was a police officer for the City of Columbia. (Depo. Claspell, p.10) Had Claspell been at trial, he would have testified that Joe Rucker attempted to engage him in a fight at the scene of the beating. (Id., p. 6) And that afterwards, Rucker was taken to Room 314. (Id., p.6, Exhibit 1) Rucker testified this never happened. Claspell's testimony directly contradicts Rucker's.

3.      There were no video cameras in the hallway between visitation and the barred entrance to that building. After the testimony of Claspell, and a review of the videotape of the entrance to visitation and the hallway leading to the bench and barred entranceway, door 97, it is clear there are no video cameras in this area. Claspell testified that there was a video camera which recorded the barred entrance to the hallway, door 97, which led to the visitation room. (Id., pp. 8-9)

All of this evidence is newly discovered by virtue of how it was revealed to the plaintiff and should be considered by the Court. The Clerk's rule not to allow the plaintiff to see Oglesby's file until the day of the trial and only under a subpoena duces tectum did not give the plaintiff ample time to determine if a further inquiry into Oglesby's criminal case was necessary. Claspell was subpoenaed thirteen days

before trial and should have been served.  There is no explanation as to why he was not served.  Clearly, his testimony is relevant and contradicts that of Rucker.  The Court should consider this evidence in rendering its decision on this motion.

4.  The Criminal File No. I-801-259-A.  The criminal file was produced at trial only after a subpoena duces tectum was filed against the criminal court clerk's office.  Counsel only had a brief period of time to review the file.  Contained in the file is the report of Detective Hagan used as probable cause.  Detective Hagan reports:

> "Det. Hagan then interviewed Timothy Lentz about the first assault to Mr. Pittman that happened on Friday.  Timothy stated he was in the cell with Mr. Pittman and Jacquez Oglesby "Quita" came into the cell and punched Mr. Pittman in the face.  He gave no warning nor did he say anything.  He just hit him.  Several of Oglesby's friends were standing in the cell door and he knew to keep his mouth shut and say nothing. (Supplemental Report, 6-7-01)

This directly contradicts Oglesby's testimony and supports what Pittman said happened.  The Court should allow the criminal court file to be made evidence as an exhibit to this motion.

Discovery of all of this evidence resulted from further inquiry post-trial into the details in the record of Circuit Court Criminal File No. I-801-259(A).  The difficulty for the plaintiff is that this evidence is not "newly discovered" within the meaning of *Seay*.  As early as March 31, 2003, almost six months before the trial, Plaintiff had filed his Amended Expected Exhibit List.  In this document Plaintiff asserts, "Comes the plaintiff and submits to the court, the following exhibits which [he] expects to introduce at trial . . . . 10.  Circuit Court file no. 1-801-259-A".  As early as March 11, 2003, Plaintiff filed his List of Expected Witnesses which included "14.  E.R. Claspell."

Under these circumstances, we cannot hold that the trial court abused its discretion in denying the Tennessee Rule of Civil Procedure 59.04 Motion.  The judgment of the trial court is in all respects affirmed, and costs of the cause are assessed to Appellant, Lee Pittman.

_____
WILLIAM B. CAIN, JUDGE